**J.M. SCHUBINER, Respondent,**

v.

**OPPENHEIMER INDUSTRIES,
INC., Appellant.**

**No. WD 34439.**

Missouri Court of Appeals,
Western District.

May 22, 1984.
Rehearing Denied Aug. 8, 1984.
Application to Transfer Denied
Sept. 11, 1984.

James Borthwick and Floyd R. Finch, Jr. of Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for appellant.

Stephen G. Mirakian of Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, for respondent.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

MANFORD, Judge.

This is a civil action seeking damages for breach of contract. The jury entered its verdict in the sum of $58,000.00. Judgment was entered in accordance with a jury verdict. The judgment is reversed.

Four points are presented, charging that the trial court erred in failing to grant a motion for directed verdict or judgment N.O.V. because (a) the evidence, as a matter of law, failed to establish a breach of duty to act with reasonable care, (b) the evidence, as a matter of law, failed to establish that management was the direct and proximate cause of the alleged damages, (c) the evidence, as a matter of law, failed to establish any damages, and (d) the submission of a verdict-directing instruction was erroneous because it submitted multiple theories of recovery in the conjunctive, there was no definition of terms used, and the evidence failed to establish all the separate factors enumerated in the instruction.

At the outset, a brief summary of the pertinent facts suffices. Any additional and applicable facts are set forth within the dispositive portion of this opinion.

Appellant, Oppenheimer Industries, Inc., (hereinafter Oppenheimer) is a corporation organized pursuant to the laws of the state of Delaware, with its home office and principal business locus in Kansas City, Jackson County, Missouri. Oppenheimer was the original defendant at trial. Respondent, J.M. Schubiner (hereinafter Schubiner) d/b/a KCJ Cattle Company, is an individual and resident businessman whose residence is Franklin, Michigan. Schubiner was the original plaintiff at trial.

Oppenheimer is in the business of providing various agricultural services to investor clients, including farm/ranch management and cattle herds. The instant proceedings involves a dispute with Schubiner relative to a contract between the parties involving breeding cattle.[1] The parties entered into an agreement on or about December 15, 1972 captioned, "Breeder Cattle Agency Agreement." Schubiner is a prominent and successful businessman whose net annual income was shown to be in the upper six figures and who was in the 70% income tax bracket. At the time of the execution of the agreement, Oppenheimer was managing some 200,000 cattle on behalf of owners/investors such as Schubiner on various ranch locations throughout the United States.

Oppenheimer does not operate the ranches where their owners/investors have cattle, but rather, it contracts with local ranchers to provide the day-to-day operation relative to the cattle. By this agreement, the owner/investor provides the cattle (by initial purchase) and the feed while, in turn, the labor is furnished by the rancher. Agreement with the rancher is on an incentive basis, whereby the rancher is paid on a bonus/penalty formula. The rancher is compensated relative to higher weight gain and better calf crop. In turn, the rancher endeavors to protect the owner/investor from adverse factors such as disease, infertility, weather injury, and death of the animals.

Oppenheimer derives its fee in two ways. At the outset, when the owner/investor initiates the cattle purchase and enters into the agreement with Oppenheimer, the latter is paid a fee. In addition, Oppenheimer collects a fee of 8½% to 10% of its expenses for the supervision of the ranchers. The solicitation for the investment plan is subject to the authority and requirements of the federal Securities and Exchange Commission. The prospectus is filed of record with the S.E.C.

1. Two plans are offered by Oppenheimer relative to cattle herds. One plan involves investment in feeder cattle and the other breeding cattle. The contract herein involves breeding cattle.

As the record discloses, the incentive or purpose of such investment by the owner/investor is two-fold. First, such owners/investors seek a tax shelter and secondly, economic gain from their investment. To qualify, owners/investors are required to either have a net worth (exclusive of residence and home furnishings) of at least $500,000, or have such net worth of $100,000 and also come within a federal-state income tax bracket of at least 50%.

The agreement herein was entered into at the suggestion of Schubiner's accountants for the purpose of providing Schubiner with a tax shelter for 1972 and future years. The parties agree that Schubiner knew nothing about raising cattle or ranch management. Schubiner stated that he knew nothing about cattle investment, except he understood that he would be able to take a tax deduction greater than his actual cash outlay and therefore would save money. At trial, Schubiner testified that his goal was a tax shelter and economic gain. By deposition introduced by appellant, Schubiner testified that the point of the plan was a tax shelter. During the life of the agreement, Schubiner "sheltered" some $70,000 of other income.

At the inception of the agreement, Schubiner's investment purchased 225 head of cattle for a price of $62,495.00. Schubiner paid 10% down and executed a note for 90% on the remaining purchase price balance. The agreement and cattle purchase occurred after the 1972 fall cattle trading season.

The length of the prospectus and the agreement prohibit setting forth both documents in detail, but particular portions pertinent to the dispute herein are, and must at various times be, set forth herein.

"Prospectus

'Agent

Agency services in connection with the management of specifically owned breeder cattle or feeder cattle or both. Oppenheimer Industries, Inc., considers the acquisition of breeder cattle or feeder cattle or both hereunder suitable only for persons in a tax bracket with a minimum income tax rate of 50% or higher.

Oppenheimer recommends a breeder cattle program be maintained for a minimum of four to five years. Feeder cattle are purchased for a single contract period which is usually less than one year or they may be purchased on a cyclical basis for fattening to slaughter during a contract period or successive contract periods at the request of purchasers hereunder. Oppenheimer makes no guarantee that a breeder cattle owner or a feeder cattle owner will realize economic gain or tax profits. The relationship between the duration of a breeder cattle or feeder cattle program and economic gain or loss is set forth herein. See "High Risk Factors—General" and "Sample Breeder and Feeder Programs".

The agency services cover all acts necessary for the absentee ownership of cattle and relate to selection, assistance in the negotiation of cattle purchases and cattle maintenance and the financing thereof, inspection, and the keeping of books and records pertaining to each prospective owner's cattle. These services are offered for all or part of a contract year. Timing of payments during the course of the contract year will be individually negotiated. See "Livestock Industry", "Contract Services Rendered by Agent" and "Additional Service Rendered by Agent".

The agency services connected with the purchase and maintenance of these livestock herds are being offered only by Agent. See "Description of Agent" and "Plan of Distribution".

Payments on livestock maintenance, care and feeding, financing if required, and agency fees will be paid in amounts and on schedules to be individually negotiated after cattle and operators satisfactory to the prospective owner are located.

The purchase of breeder cattle or feeder cattle or both hereunder is subject only to the acceptance by Oppenheimer Industries, Inc. of employment and availability of breeder cattle or feeder cattle or both....

## INTRODUCTORY STATEMENT

All contracts for agency services offered hereunder shall be entered into by Oppenheimer Industries, Inc., a Delaware Corporation (hereinafter referred to as "Oppenheimer" or "Agent"). See "Contract Services Rendered by Agent" and "Description of Agent".

Agent will submit proposed purchases of breeder cattle or feeder cattle or both to a prospective owner and upon the prospective owner's approval will purchase for the prospective owner's (hereinafter called "Owner") account the cattle approved.

Subsequently or concurrently, Agent will make recommendations to Owner on type of contracts available and the name of a rancher-contractor or feeder-contractor who will handle the feeding, care, breeding, and general management of Owner's herd. Upon the approval of Owner, a contract will be entered into. Thereafter, on a continuing basis, Agent will render additional services to Owner of breeder cattle or feeder cattle or both including, but not limited to, inspecting, auditing, consulting, contract enforcement and marketing, and will without risk of investment on its part earn as Agent continuing fees in the management of breeder cattle only, during such period as Oppenheimer acts as Agent for Owner of breeder cattle, and an initial fee only for services rendered to Owner of feeder cattle. See "Breeder Cattle", "Feeder Cattle", "Federal Income Tax Considerations" and "Conflicts of Interest".

Oppenheimer, on December 8, 1971, initially offered to purchasers hereunder 200 Agency Agreements and 650 Agency Agreements relative to breeder cattle and feeder cattle respectivly (sic). Purchasers hereunder may purchase a maximum of 163 breeder cattle programs and 616 feeder cattle programs. Your attention is directed to the information set forth on the cover page of this Prospectus and the notes thereto.

## HIGH RISK FACTORS

In considering this offer there are a number of factors throughout this Prospectus which should be considered carefully. The following are considerations which are believed to be of more general significance in evaluating the risks of ownership of breeder cattle or feeder cattle or both.

### General

In the opinion of Oppenheimer, breeder cattle or feeder cattle or both are suitable for purchase principally by people in the 50% or more income tax bracket because of the low anticipated rate of economic profit, if any, and the anticipation of substantial losses in the early years of operation of a breeder herd.

It has been Oppenheimer's experience that in the purchase of breeder cattle the probability of an economic gain at the end of the first year of ownership is remote. Accordingly, Oppenheimer recommends a breeder cattle program be maintained for a minimum of four to five years, and even then Oppenheimer makes no guarantee that a breeder cattle owner will realize economic gain or tax profits. Feeder cattle are purchased for a single contract period which is usually less than one year. Continued fattening and selling of feeder cattle in subsequent years is at the direction of each Owner. Oppenheimer makes no guarantee or representation that an owner of a feeder cattle program will realize economic gain or tax profits in the initial program or in any subsequent programs the Owner may elect to enter.

Cattle, like other agricultural commodities, are quite volatile in price. Changes of plus or minus 10 percent in the price per hundred weight of breeder cattle would be normal in any thirty day period. Fluctuations of 10 to 20 percent in the price per hundred weight of feeder cattle frequently occur within a 72 hour period. Comparable price fluctuations occur with respect to the cost of feed grain. . . .' "

## " 'BREEDER CATTLE AGENCY AGREEMENT

Gentlemen:

This will confirm my arrangement with you:

1. I am desirous of purchasing and maintaining a herd of breeding cattle and I hereby employ you as my agent and agricultural consultant to negotiate and make the necessary arrangements in connection with this plain.

2. You will select and purchase breeding cattle for such amounts of money as you will be directed by me to spend from time to time. Title to these cattle shall be taken in my name, the animals to be branded with my brand to establish their identity as belonging to me. Where specific permission from me is necessary to establish title for brand registrations, registration with a purebred association, bank loans, filing of mortgages, bills of sale, etc., I hereby grant you permission to use a photocopy of this document as authorization for the purchase of cattle provided that I have deposited sufficient funds in my cattle account to cover the equity on such a purchase.

3. You will arrange for the pasture, feeding and care, (including veterinarians), of the cattle, as well as their offspring. You will arrange for periodic and systematic inspection of the herd(s) belonging to me and eliminate such animals (when and if necessary) which may be of inferior quality for continued breeding purposes. You may join my cattle with others to get the advantage of lower costs, better care, or improved supervision. Sales beyond normal culling percentage will be accomplished only at my direction. You may take any reasonable legal action necessary to uphold my rights in cattle management contracts, mortgages, feed agreements, and other situations affecting my cattle ownership or maintenance. Should I be dissatisfed (sic) with the maintenance contract or rancher with whom I have placed my cattle, I retain the privilege of directing you to move the cattle to another location upon expiration of the contracts.

4. You are hereby directed that where it is in my best interest from the standpoint of animal husbandry and economics, you may exchange my cattle for cattle of like kind as long as the exchange is for cattle of comparable quality and equal value.

5. You will keep books and accounts open for my inspection at reasonable times at your offices, and you will render accounts and reports to me in reasonable detail. All accounts will be kept on a cash basis of accounting. I understand that inventory profit and loss, budget, and tax records are maintained on an Electronic Data Processing system, and that fees paid by you for the periodic use of computers will be an operating expense. This computer expense will not exceed a prorata charge of 35 cents per head per year without my specific permission. You will administer all funds for me through an account to be kept in my name in a Kansas City or other metropolitan bank, subject to drafts thereon by you through your legally appointed officers. All employees of your company handling my funds and accounts shall be bonded by a responsible insurance company.

6. You will insure me in responsible insurance companies against public liability with minimum benefits of $500,000 to $1,000,000 for injury to persons, and $500,000 for injury to property, and you shall send me original certificates of such insurance, which may be for our joint benefit as our interests may appear. The premiums for such insurance shall be an operating expense.

7. For your services, you shall charge me an initial fee, dependent upon the size of the herd, between four and one-half percent (4½%) and ten percent (10%) of the gross herd purchase price. In addition you shall charge me an Annual Management Fee equal to eight and one-half percent (8½%) of the funds employed to pay all annual operating expenses, excluding from operating expenses, down payment on and payments made to ammortize the principal amounts of any notes issued or assumed by me to which my herd is subject and any fees paid by me to you, as my Agent, provided however, that the minimum annual management fee shall not be less than four hundred dollars ($400). I understand

that the foregoing terms are subject to the provisions of a "Consolidated Schedule of Fees" dated June 30, 1971, which is incorporated herein by reference and made a part hereof. I further understand that any change in the "Consolidated Schedule of Fees" is subject to my prior approval. I agree that my failure to give notice as provided in paragraph 10, within 30 days after I have received notice of a change in the "Consolidated Schedule of Fees", shall act as my acceptance to the changes in the "Consolidated Schedule of Fees", as it affect (sic) my Breeder Herd Operation.

8. Subject to my written instruction to the contrary, you have my power of attorney to arrange for loans from banks or other sources against a lien on my cattle, however, without any personal liability on my part. Proceeds from such loans will be deposited in my Kansas City or other metropolitan bank account and employed in the operation of my cattle business. Where you are buying cattle subject to an existing loan, you may sign whatever documents for me that the lending agency requires to establish that title has passed to me, that I am aware of the existing loan, that I will not sell or move any of the collateral without written permission of the lending agency. Any such document may be filed with the County Recorder's Office of the county in which the cattle are located.

9. I will not hold you liable for acts of negligence upon the part of personnel that you appoint to operate my herds as long as you exercise reasonable diligence in their selection and supervision.

10. This shall comprise the entire agreement between us, and any prior negotiations are merged therein. Your signature below shall suffice to make this a binding agreement. This herd management contract may be cancelled by either party on 90 days' notice.

AGREED TO AND ACCEPTED:

OPPENHEIMER INDUSTRIES, INC. CATTLEOWNER

BY: /s/ Bill Smith      BY: J. Schubiner
                        d/b/a KCJ Cattle Co.' "

Subsequent to the execution of the agreement, Schubiner stated that he looked at his file concerning this investment once or twice a year for the purpose of deciding his continuation of it, but took no other interest in the investment. In the fall of 1974, Schubiner stated that he became dissatisfied with the program because "I wasn't getting anywhere and according to the way I looked at it I was losing money." This caused a meeting between Schubiner and two representatives of Oppenheimer. Following this meeting, Schubiner decided to continue. Schubiner continued to receive regular reports on how his cattle were doing and related matters.

On February 7, 1977, Schubiner filed suit against Oppenheimer in the circuit court of Jackson County. Oppenheimer responded by exercising its option to terminate the agreement effective June 30, 1977. Schubiner voluntarily and without prejudice dismissed his suit against Oppenheimer. On July 7, 1980, Schubiner filed the present action and amended his petition on September 27, 1982. Trial was had and after the overruling of post-trial motions, this appeal followed.

Under its first three points, Oppenheimer charges that the trial court erred in failing to sustain its motion for directed verdict, because Schubiner failed to make a submissible case. The three points are discussed conjunctively rather than individually infra, because they present a common charged error. However, at this juncture, it is necessary to discuss Schubiner's main argument against the three points because of the particular circumstances surrounding action by the trial court.

Schubiner contends that the first three points presented by Oppenheimer are improperly raised, because Oppenheimer failed to properly preserve the issue of submissibility of the question of liability and damages. This position is based upon Oppenheimer's failure to "timely" present its motion for directed verdict, i.e., at the close of all the evidence. Thus, Oppenheimer could not subsequently present a motion for judgment N.O.V. Schubiner

cites to Rules 72.01(a) and 44.01(b) with supportive citation to Rule 50(a) and (b) and 6(b) of the federal rules.

Keeping in mind that Schubiner's amended petition contained two counts, the second of which was for fraud, Oppenheimer filed a motion for directed verdict at the close of Schubiner's case in chief. The trial court heard argument on the motion. The trial court sustained the motion as to count two for fraud. As to count one, the trial court ruled, "I'm going to take the motion under advisement as to ruling on Count I and we are going to proceed with the evidence at this time." Pending the ruling on the motion, Schubiner's counsel advised the trial court that he would introduce no evidence of income/expenses relative to Schubiner's claim for damages. At this point, Oppenheimer introduced its evidence. Oppenheimer did not file a motion for directed verdict at the close of all the evidence. The record shows what did happen as follows.

The jury returned its verdict. Oppenheimer filed and argued its motion for leave of court to file a motion for directed verdict at the close of all the evidence out of time. Oppenheimer asked that its motion be considered as if filed prior to submission of the case to the jury. This motion obviously was opposed by Schubiner. The trial court, following argument on the motion, ruled:

"THE COURT: Well, as I understand it under the Rules, probably the only effect on the plaintiff by the defendant not filing a Motion for Directed Verdict at the end of all the evidence would be the defendant's right to ask the Court to enter a judgment notwithstanding the verdict. It does not affect any procedure you would have on filing a Motion for New Trial. It does not affect any error that you might feel is preserved in your Motion for New Trial. There is some substance in what you say in that you might have been misled by the Court. I did take your motion under advisement which is a little unusual. I did have some considerable difficulty in proceed-

ing with the case at the end of plaintiff's evidence. You, however, were no less sure than I was because you didn't stand on your evidence either. In any case, I see no prejudice in allowing you to file such a motion. The only thing as I can see it, the only possible effect would be to allow you to enter or request in addition to the new trial, that the Court enter judgment notwithstanding the verdict. Do you see any other implication?

MR. BORTHWICK: I think that's the implication.

THE COURT: Do you see any other implication?

MR. WADE: That is exactly the implication and that is one of the—the main reason essentially that we object is that we don't feel that it's proper at this point for the Court to be considering a motion for judgment notwithstanding the verdict on the basis of a directed verdict motion which could have been made but was not.

THE COURT: Well, I don't know the authority for the action I'm about to take but because of my position and the way this transpired and the way that my actions might have influenced the defendant, I am going to allow him to file his motion. I'm not sure whether it's appropos but in any case if there is error, it can be cured as all other errors can be cured and we will allow it to be done. In other words, I either have the authority or I don't. If I don't have the authority, you're not hurt. I'm doing it because in fairness I feel that I might, in the way the natural flow of the case was interrupted in taking the original one under advisement and informing him just before the evidence was completed on Friday morning that I was going to submit the case, that it might have misled him somewhat and for that reason, I'm going to allow him to do it."

The record also reveals that Oppenheimer filed a motion for new trial alternatively to a motion for judgment N.O.V. Both post-trial motions were overruled.

Schubiner attacks the actions of the trial court, citing to the above rules. In addi-

tion, Schubiner. provides this court with various Missouri and federal cases which rule that a party may not properly submit a motion for judgment N.O.V. unless first that party has filed a motion for directed verdict at the close of all the evidence and that motion has been overruled. Oppenheimer counters by pointing out that the matter, regardless of Rules 72.01 and 44.01 and the federal rules, would be reviewable anyway under Rule 84.13(c) for plain error. In addition, Oppenheimer references Rule 41.03, which calls for a construction of the rules so that justice may be served. One thing that is quite clear is that both parties recognize the basic issue to be an attack by Oppenheimer on the question of whether Schubiner made a submissible case.

■ Schubiner is correct when he contends that the trial court erred in permitting Oppenheimer to file a motion for directed verdict after the jury had returned its verdict. However, because of the particular facts and circumstances herein, especially in light of the confusion and apparent misleading of Oppenheimer by the trial court, this court reviews the matter under Rule 84.13 for plain error. Rule 84.13(c) permits this court, in its discretion, to consider plain errors affecting substantial rights, even though not raised or preserved, when the court finds that the error has caused manifest injustice or miscarriage of justice. If the "plaintiff has failed to make a submissible case, to permit his judgment to stand would be usually, if not always, a plain error affecting substantial rights and usually, if not always, would result in manifest injustice." *Millar v. Berg*, 316 S.W.2d 499, 502–03 (Mo.1958); *see Martin v. Brune*, 631 S.W.2d 77, 80 (Mo.App.1982). Schubiner correctly states any review of submissibility must be made upon the whole of the evidence. That review is made herein.

As noted above, since the first three charged errors present a common question, i.e., submissibility of Schubiner's case, the charged errors are discussed and ruled in the conjunctive as opposed to each point being taken up and being ruled separately.

Because of the disposition herein, the fourth charged error, i.e., the challenge to the verdict-directing instruction, is not discussed and it suffices to state that the instruction was erroneous as per MAI 1.02. This court is not unmindful of the rule announced in *Corley v. Kroger Grocery & Baking Co.*, 355 Mo. 4, 11, 193 S.W.2d 897, 900 (Mo.1946), *Knox v. Weathers*, 363 Mo. 1167, 257 S.W.2d 912, 915 (Mo.1953) and the criticism noted in *Adams v. Thompson*, 178 S.W.2d 779, 785 (Mo.App.1944). This court is also not unmindful of the confusion surrounding conjunctive submission and the need for the Missouri Supreme Court to make a positive ruling in regard to MAI 1.02. This confusion and problem notwithstanding the instant case because of the failure of Schubiner to introduce substantial evidence on each submission, renders the instruction erroneous both under the declaration of MAI 1.02 and the above case authority.

■ As noted, Oppenheimer makes the broad or overall charge that Schubiner failed to make a submissible case. Within that broad charge, Oppenheimer further points out that Schubiner premised this action for breach of contract upon the alleged negligent acts and omissions of Oppenheimer. It is clear and obvious from the record that the parties understood this to be a case where the theory of recovery pursued by Schubiner was upon negligent act/omission. Stated another way, it is clear herein that the parties understood and tried this case upon the question as to whether Oppenheimer, in the performance of its contract, acted with reasonable care. Such a claim is actionable. *Fidelity & Casualty Co. v. Arcadia Valley Realty & Insurance Agency, Inc.*, 636 S.W.2d 388, 390 (Mo.App.1982).

■ With the ruling herein that the question of submissibility is properly before this court as reviewable for plain error, coupled with the recognition that Schubiner's claim was based upon the alleged breach of contract between the parties because of Oppenheimer's alleged negligence, this court now directs its attention to the

varied charges of negligence and the particulars of the evidence in relation to those various acts of negligence.

It is charged by Oppenheimer that Schubiner failed, as a matter of law, to prove Oppenheimer failed to act with reasonable care, that Oppenheimer's management of Schubiner's herd was the direct and proximate cause of Schubiner's damages, and Schubiner's evidence failed to establish injury with sufficient specificity because that evidence failed to include the different income/expense factors which would have affected the after-tax net value of Schubiner's herd.

It must be noted throughout these proceedings that Schubiner made no claim against Oppenheimer for any loss relative to the tax-shelter portion of the plan. Schubiner filed and has proceeded only with a claim upon the alleged loss of income under the plan. Throughout, Schubiner's position has been that the tax-shelter portion and the income portion of the plan are separable and that his claim arises from the negligence of Oppenheimer as regards the income portion of the plan. Oppenheimer, of course, takes the position that the tax-shelter and income portions are inseparable.

In summary, Schubiner charged that Oppenheimer failed to use reasonable care and skill, and hence was negligent in (1) selecting and purchasing reasonably fit cattle for his breeding cattle investment program, (2) selecting and purchasing a properly balanced or mixed herd for the purposes of a breeding cattle investment program, (3) supervising and managing the culling operations of his herd, (4) supervising and managing the breeding operations of his herd, (5) exchanging his cattle for cattle of like quality and value for the year 1976, and (6) insuring that each of the cattle of calf-breeding age, purchased for his initial herd, were pregnant at the time of purchase.

Oppenheimer contends that Schubiner's entire claim was based upon the numerical growth of his herd for the four to five year period, measured in terms of growth in numbers of animals, compared to various adjusted national averages. Oppenheimer thus claims that such evidence fails to establish any negligent management or breach of duty to Schubiner.

In contrast, Schubiner contends that in addition to his evidence of growth in numbers of animals as contrasted with various adjusted national averages, there was additional evidence to support his claim of negligent management and hence, a breach of duty owed him by Oppenheimer.

In addition to his own testimony, Schubiner presented three witnesses. Since Schubiner pursued his claim upon alleged negligent management by Oppenheimer under the above six alleged acts/omissions, it becomes the responsibility of this court on this appeal to determine if from the whole of the evidence Schubiner established each element of his claim so as to have constituted a submissible case.

Schubiner, by his own testimony, contributed nothing relative to the issue of alleged negligence. He testified to being a very successful Michigan businessman who was directed to the agreement with Oppenheimer by his own accountant. Schubiner testified that he had absolutely no experience in agricultural matters. He stated that the agreement "was offered to me as a tax shelter and as an investment to hopefully make a profit on." Schubiner further stated, concerning his anticipation about the plan, "Well, on an annual basis, it was going to provide a tax shelter and at the end of the program, I would sell the cattle off for a capital gain and make a profit on it." He explained his anticipated gain because it was a breeding cattle operation. Schubiner testified that from the time of the initial herd purchase and throughout the plan, he followed Oppenheimer's instructions. In 1974, Schubiner wrote to Oppenheimer, advising that he was dissatisfied with the plan because according to his opinion, he "wasn't getting anywhere and according to the way I looked at it, I was losing money."

In response to this letter, a meeting was held between two representatives of Op-

penheimer and Schubiner. According to Schubiner, the Oppenheimer representatives discussed with him a proposition of growth of his herd, and he in turn decided to continue to invest funds in the plan. It is evident from Schubiner's testimony that he was attempting to establish a misrepresentation to him by the Oppenheimer representatives in support of his claim for fraud (Count II of his amended petition). The trial court properly dismissed that claim because none of Schubiner's evidence sufficed to support that allegation.[2] It can be also stated that Schubiner, by his own testimony, offered nothing in support of his allegations of negligence regarding selection/purchase of reasonable fit cattle, the selection/purchase of a properly balanced or mixed herd, the supervision/management of culling operations, the exchange of cattle, or the insuring of pregnancy. By his own testimony, Schubiner admitted that the cattle breeding operation was something "[he] didn't really keep abreast of so to speak. [He kept] the files at home and as a matter of fact, all of the correspondence that came in was addressed to [his] home and [he] placed them in a file and ... really wasn't involved with in on a daily basis. [He] maybe looked at it once or twice a year and that was it."

In addition to his own testimony, Schubiner called three witnesses. The first two were Ronald Jarvis, President of Oppenheimer and William Smith, Vice President of the livestock program for Oppenheimer. The third witness was Don Pretzer, an employee of the Division of Extension for Kansas State University. Pretzer testified that he held a Ph.D. in the field of agricultural economics.

The record fails to support Schubiner's claim that either Jarvis or Smith offered any evidence in support of his claim that Oppenheimer was negligent in selecting and purchasing reasonably fit cattle for his breeding cattle investment program, and/or selecting/purchasing a properly balanced or mixed herd for purposes of a breeding cattle investment program [i.e.,

(1) and (2) above]. While Schubiner argues on this appeal that Jarvis, by his testimony "admitted" that growth in the number of animals in the herd is the principal objective of the program, what Jarvis really was asked and answered is shown as follows:

"Q. Is growth in numbers the only objective of a breeding cattle program?

A. It's a principal objective, but the real principal objection is *growth in value.*" (emphasis added).

Schubiner then relies upon the testimony of his expert, Pretzer, regarding points (1) and (2) above. Schubiner argues that Pretzer testified, "that this herd was not balanced or mixed with enough mature animals to reasonably accomplish the Plaintiff's dual objectives of tax shelter and investment value increase through increased herd size." Pretzer did not so testify, but rather, he was asked a hypothetical question and responded as follows:

"Q. (By Mr. Mirakian, attorney representing Oppenheimer) Mr. Pretzer, I will ask you to assume that the objective of this program, the investor's objective was to obtain certain economic growth in his investment through growth of his herd as well as certain annual tax benefits. And I will ask you to assume that the Oppenheimer program has essentially two primary objectives and that is providing tax shelters as well as providing hopefully, economic gain for the investors through growth of the herd. Now, making those assumptions and looking at this herd as it was actually mixed when it was initially purchased for Mr. Schubiner, can you form any opinion as to whether or not the initial mix was done with reasonable care and skill?

A. With those objectives of growth and numbers, I think we could look at the initial herd and realize that it's going to be on down the road quite a ways before we ever get them fully into production and get our numbers to multiplying and with that objective, you would want some more older animals in there in order to achieve growth that would produce more

2. No appeal lies from the dismissal of the fraud claim.

quickly. If I wanted to get a whole group of kittens around my house, well I wouldn't—very quickly, I wouldn't go out and buy a kitten to do it. I'd buy a mature cat, you know, that could have a litter of cats real quickly and it's no different than the cattle business."

From the above, it cannot be concluded that Jarvis, Smith, or Pretzer, by their testimony established any negligence by Oppenheimer regarding the selection/purchase of reasonably fit cattle for a breeding investment program, or the selection/purchase of a properly balanced or mixed herd for a breeding program [i.e., (1) & (2) above].

It should be noted that neither Jarvis, Smith nor Pretzer ever saw any of Schubiner's cattle, nor did any of these three witnesses ever specifically observe the operation, at the ranch level or at a ranch location, of the Schubiner program.

It is evident from a reading of the record herein that the parties do not dispute the fact that mature cattle are more susceptible to breeding and hence produce calves while immature cattle do not. Schubiner insisted at trial, and continues to do so on this appeal, that Oppenheimer was negligent in the selection/purchase of mature cattle for production purposes. At this point, the record goes wanting for evidence of any negligence. What the evidence shows by the Pretzer testimony is a hypothesis that if one starts with a certain number of mature animals, then by the end of a specified period, it is to be expected that the herd will have grown in numerical size. There is no evidence that at the time Schubiner's plan was initiated, within the limits of his initial investment, there were more healthy, mature cattle available. In addition, it is not disputed between the parties that mature cattle cost more than younger or immature cattle.

What is revealed is a subsequent or later insistence by Schubiner that more mature cattle should have been initially purchased. With a limited investment amount, any purchaser would be faced with a decision to purchase a greater number of mature cattle at a greater cost, which would reduce the overall number of the herd as compared with a purchase of fewer mature animals at a greater overall number of the total herd. The sheer allegation that a greater number of mature animals should have been purchased initially proves nothing in and of itself.

The Schubiner plan, as well as other breeding plans, works upon a plan of bonus/penalty to the rancher which calls for not only numbers but the quality of the herd. The record shows that for the sum invested by Schubiner, he could not have purchased 225 mature cattle. The evidence reveals that a purchaser buys "what is available, which has the most value, for the price you want to pay ..." The evidence revealed that the mix of the herd at its origin was confined by the amount of monies for the investment and the cattle available for purchase. The evidence simply fails to establish that Oppenheimer was negligent in the selection/purchase of cattle for a breeding program, and/or the mix of the herd. The mix of the herd, as the evidence shows, is derived from the availability of animals at selection/purchase, plus the relative prices of mature animals (cows) compared with immature animals (heifers).

Schubiner alleged further that Oppenheimer was negligent in the supervision and management of culling operations of the Schubiner herd.[3] Schubiner contends that Pretzer and Jarvis agreed that the culling rate varied, depending upon the age and category of animals to be culled. Schubiner further contends that these two witnesses further agreed that Cull rates for animals less than four years should not exceed 10% (per annum) and for mature

---

3. Culling is the process by which certain numbers of any herd are removed from that herd because of varied reasons, i.e., disease, being barren, or a particular animal no longer contributes to the overall plan. Culling is done in the fall of each year. The investor (Schubiner) receives as income any monies from the sale of the culls.

animals (five years or older) the cull rate (per annum) should not exceed 20%.

Schubiner contends that Jarvis acknowledged that cull rates for the entire Schubiner herd in 1973 should have been closer to 10% as opposed to the 15% cull rate determined by the evidence, because of the overall young age of the herd. That claim as to the Jarvis testimony is not in its entirety correct. What Jarvis was asked and answered is as follows:

"Q. And you do the same thing with your cull rate, don't you? You take the total number of animals at the beginning of the year and you look at how many were culled from that class and you can tell how many percent were then culled during that year?

A. That's right.

Q. Okay. Now, in terms of Mr. Schubiner's herd, that was purchased in 1972 and again, we know from looking at Exhibit No. 7 and Exhibit No. 17—and I will show you those again if you'd like but there were 157 open yearlings, 34 first calf heifers and 17 bred yearlings out of that group.

A. (Nods head.)

Q. Okay? And then we had 17 cows which are between the four and five years group in Mr. Schubiner's herd?

A. I didn't know that they were between the four and five.

Q. Let's say over four.

A. But they are cows, yes.

Q. All right. So out of 225 head then, we have 208 that are less than four years of age?

A. Okay.

Q. All right. And that equates out to 92 percent. Do you have any objection to that equation?

A. I will take your word for it.

Q. All right. Now, if we have 92 percent of our initial herd that is less than four years of age, and we take the figures that you said that you agreed to, given by Mr. Oppenheimer in terms of the 10 percent expected cull rate for animals less than four years of age, should we assume or perhaps we shouldn't, but we assume that a weighted average cull for that particular herd in the first year should be as high as 15 percent?

A. You shouldn't assume that, no.

Q. In fact, for that particular herd, it should be a good bit less than 15 percent, shouldn't it, in the first year.

A. An average would be but you can't control the circumstances.

Q. But an average would be—

A. Yes.

Q. —closer to 10 percent for that year than 15 percent, wouldn't it?

A. Yes, rule of thumb would be correct.

Q. Okay. Because as we look at our herd year by year, we can't simply say that this 15 percent rule of thumb applies without relating it to the balance or seeing how his herd was balanced in each year, isn't that true?

A. That's right.

Q. So when you said earlier that 15 percent rule of thumb, essentially that would only apply if you had a herd balanced in such a way that approximately a certain number of your animals were in the 20 percent cull range and some were in the 15 percent cull range and some were in the 10 percent cull range?

A. I guess so."

What the foregoing reveals is not any negligence by act or omission by Oppenheimer regarding culling, but rather, the foregoing reveals culling percentages simply weighed against or compared with averages. The evidence does not reveal if the culled animals were properly or improperly removed, because they were barren, diseased, injured, or for any other reason. Schubiner via the Jarvis testimony merely compared the percentage of culls in his herd with national averages and thus disclosed a variance. The evidence failed to include any reference or proof of the various factors upon which the management and supervision of the culling operation (i.e., the determination to cull) was based. From the mere comparison of averages, there is no basis to determine whether Oppenheimer was negligent.

Through Pretzer, Schubiner attempted to show Oppenheimer's negligence in the supervision/management of the culling operation. Schubiner contends before this court that "the weighted culling percentages throughout the term of the plaintiff's investment exceeded that which Dr. Pretzer opined should have occurred under conditions of reasonably skillful and careful management." What Pretzer actually testified to is as follows:

"A. Well, it's obvious that the percent calf crop is lower, slightly lower, not a great deal, when you average out the mix of the herd and throw in the lower percent for the first calf heifers than what my projections are. This is one of the first indications I would look at in analyzing any ranch operation, is what kind of a calf crop are they getting out there. That's the name of the game. And so if it's below average, then I would certainly start making the initial implication, 'Hey, there's something not quite up to par out here,' if this particular operation cannot at least perform in an average situation.

Now, in terms of culling, if I were looking at this situation with the goals that you laid out there with the dual benefits of the tax benefit as well as growth in numbers for the economic gain, I would certainly want to make a maximum number of those qualify for capital gains. Namely, that they be held for two years before they are qualified. So in '73 and '74, it appeared to me that that goal, that the culling rate was higher than you would want to achieve that goal of keeping those animals around long enough to qualify for the capital gains tax benefit that you saw partially how it worked yesterday. So we would look at that and the other thing with the goal in mind that we'd discussed previously would be to have some animals in there that would get to producing quickly. Early on, is the name of the game if you're going to be in for a given period of time and not devote your lifetime to it. The other thing then, and there's some support for doing it that way for a short-

er period of time than what a normal rancher would devote his whole life to it in an investor program. *So if you kind of weigh all these things together, then I would say the performance was not up to average which I would want it to be at least that good."* (emphasis added)

What the foregoing testimony establishes is Pretzer's consideration of what the dual purpose or goal of the Schubiner herd was (i.e., tax shelter plus a gain of investment) and what, in his opinion, the Schubiner herd should have been culled at to have reached the dual goal *compared with national stock averages.* There is nothing in Pretzer's testimony which alleges negligence, either by act or omission by Oppenheimer. It must be noted that Pretzer also testified that over a five-year period such as the Schubiner plan, a 15% cull rate was acceptable. The evidence shows that the cull rate for the Schubiner plan was 12% over the five-year period.

Turning to Schubiner's claim of negligence in the supervision and management of the breeding operations of his herd, Schubiner again relies upon the testimony of Pretzer. On this appeal, Schubiner contends that Pretzer testified that the calf crop percentage of 83% achieved by defendant's supervision and management for the plaintiff's herd during the years 1973 through spring, 1977, was too low to indicate reasonably skillful management. What Pretzer actually testified to was as follows:

"A. I'm sorry, I think I left the wrong impression there. Eighty-three was what my projection came out with which would be reasonable for that kind of a mix on just that one indicator without looking at culling and the other factors which we would need to have the growth which you would expect or starting out with a mix of numbers that you want in growth.

Following the above testimony, Pretzer concluded that in his opinion, considering all the factors, action by Oppenheimer did not indicate a reasonable degree of skill and management. The problem with the

Pretzer testimony is that it merely is a comparison of what occurred with the Schubiner herd as compared with national averages, and included no act or omission by Oppenheimer which could be defined or determined as negligent. It must be further noted that Pretzer, in his testimony, established an 85% average for calf crop and the evidence further reveals that for the years 1973, 1975, 1976, and 1977 the Schubiner herd achieved an 85% for calf crop.

Schubiner's claim was also based upon alleged negligence by Oppenheimer in the supervision and management of breeding operations of his herd [i.e., (4) above]. Schubiner's claim on this point rested upon Pretzer's testimony that calf crop percentages are a particularly good indicator of overall supervision/management of a herd. Pretzer based this conclusion in part because it includes consideration of breeding, culling, initial herd mix or balance, and the care and feeding of the animals.

Pretzer testified that during the period from January, 1973 through January, 1977, the *national* calf crop average was 91.18% for all types of herds, including breeding herds. There was evidence that the 91.18% included milk-producing cattle which caused the national average to be higher. The Schubiner herd contained no milk-producing cattle. Before this court, Schubiner then contends that the 83% calf crop of the Schubiner herd during 1973–77 was too low to indicate reasonably skillful management. Once again, this evidence was derived by comparison between the Schubiner herd merely by percentages of calf crop and the national average. Further, as noted above, Pretzer also had testified that with the mix of the Schubiner herd, he also had come up with an 83% production percentage. Once again, there was no evidence of act or omission by Oppenheimer which could be said to have been negligent.

Schubiner further alleged that Oppenheimer was negligent in the exchange of his cattle for cattle of like quality and value for the year 1976. It is noted that Schubiner made no such claim for the remaining four years of the plan.

What occurred was the exchange of 38 seven to ten year-old cattle for 29 five to seven year-old cattle. There was no evidence of the individual or collective value of the cattle exchanged. There was no evidence as to why this cattle exchange occurred (i.e., such factors as disease, age or infertility of the younger cattle). The only evidence offered by Schubiner on this point was his analogy expressed as follows:

"A. Well, those numbers that we just looked at, we are transferring in a bunch of old people to do the task of middle-aged in terms of human terminology. We have been talking about what the most productive time of a cow's life is and it's certainly that four-year plus age, and it seems to me from these figures that you gave me, that that age increased and we would not expect as many calf crops off of this. It would have to be culled more quickly and so forth."

The above evidence goes wanting because there was no evidence as to whether the older cattle failed to produce and/or whether the replacement of younger cattle arose because of some fact which determined that the younger cattle were no longer of benefit to the herd. Schubiner provided no evidence of either act or omission showing where Oppenheimer was negligent by the exchange of animals within the Schubiner herd.

Under his last allegation of negligence, Schubiner charges that Oppenheimer was negligent by not *insuring* that each of the cattle of calf-breeding age purchased for his initial herd was pregnant at the time of purchase. It must first be noted that the agreement between the parties does not require of Oppenheimer any assurance or guarantee that all of the calf-bearing aged cattle purchased for Schubiner were pregnant. Even Pretzer, in his testimony, did not state that pregnancy testing was required.

It is suggested by Schubiner on this appeal that his expert witness Pretzer ex-

pressed his opinion that Oppenheimer had failed to use reasonable skill and care in the verification that mature animals were pregnant at the time of the initial purchase. What in fact occurred was that Pretzer was asked if 68 mature animals had been pregnancy-tested then one could reasonably expect a 95% calf crop. What Pretzer actually stated was as follows:

"A. Yes, if we knew that for sure, that they were pregnancy-tested adequately, we'd expect a higher than 85 percent but I didn't know that so I'm taking national averages and modifying it for the kinds of conditions of where these cattle were physically located around the country."

From the foregoing, it is clear that the 95% calf crop percentage referred to results upon proof that the calf-bearing animals were in fact pregnant at the time of purchase. What Schubiner attempts to establish is somehow Oppenheimer was negligent since his calf crop did not reach the 95% figure when the only factors offered in evidence were the assumption that 68 cattle were in fact pregnant and by a national average, a calf crop of 95% would result. There is nothing within the Pretzer testimony on this issue which indicates Pretzer's opinion was that Oppenheimer failed to use reasonable care and skill in the determination of the pregnancy of the mature cattle. Pretzer offered no testimony as to the method of pregnancy testing, if any, by Oppenheimer. His testimony on this point amounted to nothing more than his opinion that pregnancy testing should occur and if the mature cattle were found to be pregnant then, as compared with national averages, a certain percentage of calf crop should follow. Oppenheimer never denied that it did not require pregnancy testing by the ranchers at the time of the acquisition of a herd such as Schubiner's herd. The deficiency in the evidence is Schubiner's failure to prove that pregnancy testing is required (Schubiner could not prove that Oppenheimer insured the pregnancy of the animals, because the agreement as between Oppenheimer and Schubiner placed no such obligation upon Oppenheimer) or alternatively, that the selection methods employed by Oppenheimer were negligent by way of any act or omission of Oppenheimer.

What this case presents for the first time before the courts of our state is the attempt to recover for alleged damages for alleged negligence based upon the testimony of an expert that the ultimate results achieved in the development of a breeding cattle herd failed to meet or surpass national cattle averages. The evidence upon the whole record fails to establish any negligent act or omission by Oppenheimer which revealed that herd management was not done with reasonable care or skill. Such approach urges this court to ignore other elements over which the charged party (the agent-Oppenheimer) had no control. Stated another way, Schubiner urges this court to adopt a rule whereby negligence of an agent might be inferred simply because the overall production level or output fails to equal or exceed some national standard or national average declared for that particular business endeavor or activity. This court is urged by Schubiner to conclude that Oppenheimer was negligent solely upon the showing that the resultant production of the Schubiner herd did not comport with some national average within the cattle industry. There has never been such a ruling by our courts, and Schubiner has presented no justifiable reason or rationale as to why such rule should now be established.

There is no question that this action was presented and tried, and the jury was instructed upon the negligence of Oppenheimer. The applicable standard for judging Oppenheimer's performance, of course, is whether Oppenheimer acted with reasonable care regarding Oppenheimer's performance relative to the contract as between the parties. This is the applicable standard. *Nation-Wide Check Corp. v. Robinson*, 479 S.W.2d 192, 195 (Mo.App. 1972), *Fidelity & Casualty Co. v. Arcadia Valley Realty & Insurance Agency, Inc.*, 636 S.W.2d, *supra*, at 390.

Since Schubiner pursued his recovery upon a theory of negligence, his burden of proof upon the whole of the evidence, in order to make even a submissible case, requires that he "produce substantial evidence that will support each and every element of the cause of action. No fact essential to submissibility can be inferred in the absence of a substantial evidentiary basis. Liability cannot be based upon speculation, conjecture, or guesswork." *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 211 (Mo.App. 1976), *Probst v. Seyer*, 353 S.W.2d 798, 802 (Mo.1962) and *Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 529 (Mo.App. 1981). Our courts will not supply missing evidence or give a party the benefit of unreasonable speculative or forced inferences. *Levin v. Sears, Roebuck & Co.*, 535 S.W.2d 525, 527 (Mo.App.1976).

What Schubiner in essence urges to this court is that a rule of strict liability be imposed upon an agent charged with the management and supervision of an investor's cattle herd simply by the investor's display that results of his herd did not equal or surpass national cattle averages. This urging is a marked departure from our well known and well accepted requirements relative to a proof of alleged loss premised upon the alleged negligence of an agent. Our courts have long recognized that "negligence is a departure from the measure of conduct the community expects for the protection of others against unreasonable risk of harm." *Joyce v. Nash*, 630 S.W.2d 219, 222 (Mo.App.1982). This is a sound definition which in turn has served as the basis for what is required by way of proof by a party claiming that another's conduct has or was in fact negligent. The required quantum of proof has been clearly defined. *Tri-Continental, Probst,* and *Francisco, supra.*

What the evidence upon this record presents is what Oppenheimer correctly urges to this court, and that "at best the only logical inference from the evidence was that failure in herd growth might have been defendant's fault." The evidence simply fails to establish any act/omission by Oppenheimer which, even by inference, could have been described as negligent and which, in turn, caused a failure in the growth of Schubiner's herd. What the evidence simply shows is by comparison, the Schubiner herd did not reach, meet, or exceed in some instances a generalized national standard or average for the cattle industry. Stated in a more simple way, Schubiner's evidence did not establish any failure of supervision or management by Oppenheimer in the control of Schubiner's herd.

In summary, it is noted that the trial court erred in permitting Oppenheimer to file a motion for directed verdict, after verdict. However, as noted above, as a direct result of the confusion and misdirection by the trial court, this court has, in turn, reviewed the issue of submissibility within Rule 84.13 for plain error.

It is clear from the whole of the evidence upon this record that Schubiner pleaded and tried his case upon the alleged negligence of Oppenheimer relative to the latter's prescribed duties arising from the contract as between the parties. The evidence herein, when reviewed as a whole, fails to reveal any negligent act or omission by Oppenheimer in regard to its prescribed duties and hence, Schubiner failed to make a submissible case upon the alleged failure of Oppenheimer to exercise reasonable care and skill in the management of the Schubiner herd as a matter of law.

The judgment is reversed.

All concur.