Cheri Alice MICHAUD et al., Plaintiffs-Appellants,

v.

Granelle BURLINGAME, Defendant-Respondent.

No. 9323.

Missouri Court of Appeals,
Springfield District.

Jan. 23, 1973.

A. L. Shortridge, Joplin, for plaintiffs-appellants.

Malcolm L. Robertson, Blanchard, Van Fleet, Robertson & Dermott, Joplin, for defendant-respondent.

TITUS, Chief Judge.

Philip Michaud perished in a black Camaro that figured in a collision with a lighter colored Bel Air driven by defendant. Decedent's children instituted this wrongful death action (§ 537.080 et seq., RSMo 1969, V.A.M.S.) and now appeal because the Circuit Court of Jasper County

directed a verdict for defendant at the conclusion of their evidence.

█ To reecho—In deciding whether plaintiffs made a submissible case, we accept their evidence and all reasonable inferences springing therefrom as true [Brubaker v. Moore, Mo., 432 S.W.2d 216, 217(1)], mindful that when a trial court assumes the drastic course of granting a motion for a directed verdict, it may do so unerringly only when all of the evidence and permissible inferences so strongly oppose the plaintiffs there can be no room for sensible minds to disagree. McCarthy v. Wulff, Mo., 452 S.W.2d 164, 168(3); Wehrkamp v. Watkins Motor Lines, Inc., Mo., 436 S.W.2d 698, 700.

The evidence set the scene thusly: 529 feet south of eastwest Mount Hope Road between Joplin and Webb City, U. S. Highway 71 (a/k/a Range Line Road) runs straight north and south and presents a "real slight" upgrade to northbound motorists. The concrete traveled portion of the highway is 48 feet 16 inches wide and marked into four unseparated lanes—two each for northbound and southbound traffic. Three or four residences are situate west of the highway; an open field lies east of the east graveled highway berm. The posted speed limit was 45 miles per hour. No traffic signs, signals or artificial highway lights were in the area. Prior to the casualty it had been raining hard, it was still "raining" or "misting rain" at the time of impact and the pavement was "very wet." The impact occurred near 10 p. m. under light conditions described as "pitch black."

Portions of defendant's deposition read to the jury reveal that at and before the collision, she was driving north in the easternmost traffic lane at a speed of 30 to 35 miles per hour. The headlights on defendant's car were burning on "drive" (as opposed to high beam), the windshield wipers were in operation and the misting rain did not "in any way interfere with [her] vision ahead." Defendant's automobile was "in good mechanical condition," the brakes operated properly, it had "good lights on high beam," and the tires had a "good tread." Defendant had traveled a considerable distance north on the highway before reaching the site of the occurrence without encountering any northbound or southbound vehicles. She said no cars were following her and nothing transpired to divert her attention as she was driving "within the last two or three minutes before the collision." We repeat some of the exact questions and answers: " 'Question. In other words his car was directly ahead of you when you first saw it? Answer. Yes.' " " 'But to my left. . . .' " " 'Question. What part of your car came into contact with what part of his car? Answer. My half of the car came into contact with his hind fender. Question. The left rear fender? Answer. Yes.' " " '. . . Question. You use the phrase that when I caught a glimpse of his car out of my left eye. Is your vision good in both eyes? Answer. Yes.' " " 'Question. When you first saw the Michaud car it was straight ahead of you, was it? [Answer] No, he was to my left.' "

Officer Norman Boyd investigated the accident for the Joplin Police Department. Several people (including Webb City's Police Sergeant George Hancock) were already at the accident scene when he arrived. Ambulance attendants informed him that Michaud, the Camaro's sole occupant, was dead. In the course of the investigation, Boyd discovered debris in the east traffic lane which he "figured was the approximate point of impact." Neither vehicle had been moved before he arrived. The decedent's Camaro was 30 feet 2 inches north of the debris, headed north-easterly across the line dividing the two northbound traffic lanes. Defendant's automobile was 20 to 25 feet south of the Camaro headed due east; its front wheels were on the east shoulder "right at the grass area and part of the back was in the outside lane." There were no tire or skid marks on the pavement. The officer observed

defendant's car had received damage to the left front and left side with "a crumpling back on the right front fender." Michaud's Camaro had sustained damage to the left rear quarter panel and left side. This witness recollected that lights were burning on defendant's vehicle but he could not recall whether or not any lights were burning on the Camaro. When Boyd subsequently interviewed the defendant, she recounted that she was traveling north in the outside (east) lane about 35 to 45 miles per hour and had not seen the Camaro until she was "just approximately 10 feet from him and that he was sideways in the road." The officer's written report, based upon what defendant had related, showed the Camaro "was headed west" when observed by defendant. Defendant did not tell the officer the Camaro had no lights or that it "was stopped in her traffic lane."

Sergeant Hancock of the Webb City Police (who arrived ahead of Officer Boyd) testified the left headlight, "two running lights or parking lights," and the left rear tail light were burning on the Camaro when he got to the scene. This witness also identified marks appearing in a photograph illustrating the driver's side of defendant's vehicle as "black paint."

The final witness for plaintiffs was the service manager of a new car dealer whose employer was authorized to conduct safety inspections and braking tests for the State of Missouri. In a car similar to defendant's, he had conducted stopping tests at the scene of the involved accident on dry pavement. The witness said at 30 miles an hour the stopping distance was 30 to 32 feet; at 40 miles an hour the automobile was stopped in 40 to 44 feet. On wet pavement, the witness opined, the braking distance would be 35 feet at 30 miles an hour and 44 to 45 feet at 35 miles per hour. These distances did not include the "standard reaction time," which the service manager said was "three-quarters of a second." Both this witness and Officer Boyd agreed with plaintiffs' counsel that by "Missouri Statute" and "under the law"

the "legal distance for high beam that the lights must show objects ahead [is] 500 feet." [Contrary to this, § 307.060 RSMo 1969, V.A.M.S., requires that multiple-beam headlamps should be of such intensity as to reveal persons and vehicles ahead at least 350 feet for the uppermost distribution of light and at least 100 feet for the lowermost distribution of light. Save for the dimming regulations contained in § 307.070 RSMo 1969, V.A.M.S., it provides: "Every person driving a motor vehicle equipped with multiple-beam road lighting equipment, . . . shall use a distribution of light . . . directed high enough and of sufficient intensity to reveal persons and vehicles at a safe distance in advance of the vehicle."]

Specifically, in their brief, plaintiffs say the trial court erred in directing a verdict for defendant because "[t]here was evidence from which the jury could have found that defendant was negligent in failing to keep a careful lookout, or saw or could have by the exercise of the highest degree of care seen plaintiffs' father in a position of imminent peril in time to have avoided this collision and his resulting death."

It would have been error for the trial court to have submitted this case to the jury on the alleged primary negligence of defendant for failure to keep a lookout unless substantial evidence existed from which the jury could have reasonably found that defendant in the exercise of the highest degree of care, could have seen decedent sooner than she did [Levin v. Caldwell, Mo., 285 S.W.2d 655, 659(3)] and in time thereafter to have taken effective precautionary action. Corbin v. Wennerberg, Mo.App., 459 S.W.2d 505, 507(3); Shelton v. Bruner, Mo.App., 449 S.W.2d 673, 679; Hawkeye-Security Ins. Co. v. Thomas Grain Fum. Co., Mo.App., 407 S.W.2d 622, 625(2); Committee's Comment, MAI 17.05, p. 144. Having the ability and means to avoid a collision means more than mechanical appliances, such as brakes, with which to slow or stop; it also in-

cludes the existence of sufficient time and distance to take effective action in avoidance. Zalle v. Underwood, Mo., 372 S.W. 2d 98, 102(2); Stegall v. Wilson, Mo.App., 416 S.W.2d 658, 662(3). Plaintiffs had the burden of proving all facts and circumstances essential to submission of the negligence charged. Williams v. Boone, Mo. App., 413 S.W.2d 36, 40(2). The onerous task confronting plaintiffs was compounded by the fact they were relegated, in part, to defendant's deposition testimony and had no eyewitness or direct proof of any failure by defendant to maintain a lookout, but had to rely on inferences gleaned from the sparse surrounding and attending known circumstances. Chandler v. Mueller, Mo., 377 S.W.2d 288, 289.

■ Plaintiffs asseverate that it cannot be presumed the decedent was guilty of negligence contributing to his death. Meier v. Moreland, Mo., 406 S.W.2d 97, 100(2). How this correct abstraction aids plaintiffs escapes us; the court nisi directed the verdict not because decedent was contributorily negligent but because it believed plaintiffs had not sustained their burden of demonstrating negligence on the part of the defendant. Plaintiffs additionally contend that where "one is charged with the duty to look and to look is to see, [defendant] must be held to have seen what looking would have revealed." Combellick v. Rooks, Mo. (banc), 401 S.W.2d 460, 463(2); Hildreth v. Key, Mo.App., 341 S.W.2d 601, 606(5). The truth of this rule cannot be denied if for no other reason than the avoirdupois it has accumulated through constant repeatings. Nonetheless, ere this rule may be apt there must be cogent evidence that decedent's vehicle was actually visible when defendant looked or that decedent could have been seen had defendant looked, or there must be factual evidence of distance, speeds and locations of the respective automobiles at some given time from which calculations could be made that would disclose with certainty that decedent was visible to defendant.

Haymes v. Swan, Mo.App., 413 S.W.2d 319, 324.

■ Although it appears plaintiffs' counsel did everything possible to fill the evidentiary hiatuses permeating the case, the story of this accident contains too many insurmountable lacunas to permit recovery by the plaintiffs on the charge that defendant did not maintain a careful lookout. In the absence of substantial evidence establishing negligence, it is presumed that defendant was using due care [Lindsay v. Wille, Mo., 348 S.W.2d 1, 4(3); Davidson v. Hennegin, Mo., 304 S.W.2d 836, 839(4)], which means we start with the assumption defendant was maintaining a careful lookout ahead and laterally as she proceeded northward along the highway. There is no evidence of the position or location of decedent's Camaro at any time until the defendant was "approximately 10 feet from him." At that moment the Camaro "was sideways in the road . . . headed west" and located ahead of and to defendant's left. Considering the speed of defendant's car, it is admitted the distance of 10 feet "was inadequate for her to have reacted and taken any evasive action." We do not know if the Camaro, when first sighted by defendant, was stopped or in motion, and if in motion, we do not know its speed or whether it was traveling forward or backward or skidding sideways in any one of the 360 degree possible directions. Even if we assume the headlamps on defendant's car complied with the requirements of § 307.060, supra (Leek v. Dillard, Mo.App., 304 S.W.2d 60, 68), the evidence is devoid of a single fact that would place the Camaro within the illumination of the headlights on defendant's car which would render it visible to defendant before she actually saw it or which would have made it visible so as to afford defendant sufficient time and distance to have taken effective action to avoid the collision. There was no showing the lights were burning on the Camaro prior to or at the time of the casualty. But accepting

Sergeant Hancock's statement that lights were burning at some unspecified time after the accident and ignoring the general rule that it is not permissible to infer backwards from a past condition to establish the existence of a like condition at a previous time [Dugan v. Rippee, Mo.App., 278 S.W.2d 812, 816(8)], there is no testimony or evidence as to where the Camaro was situate or in what direction its lights may have been shining before it was observed by the defendant which would permit the jury to reasonably find that defendant could have seen the Camaro sooner than she did [O'Neill v. Claypool, Mo., 341 S.W.2d 129, 135(12)] and in time thereafter to have taken available and effective precautionary action. Ochs v. Wilson, Mo.App., 427 S.W.2d 748, 751.

Much of what has been said anent plaintiffs' charge of primary negligence regarding lookout applies to their claim of humanitarian negligence. The rule that the burden is on plaintiffs to prove every constitutive element of their cause of action has not been changed by Missouri's humanitarian doctrine and a humanitarian case which leaves one or more of the essential elements to speculation, guesswork or conjecture is not for the jury. White v. Burkeybile, Mo., 386 S.W.2d 418, 424(8); Bunch v. Missouri Pacific Railroad Company, Mo., 386 S.W.2d 40, 42(2). In this case, liability under the doctrine had to be predicated upon the basis that decedent came into a position of immediate danger in which injury to him was reasonably certain if the existing circumstances remained unchanged. Dixon v. Kinker, Mo.App., 410 S.W.2d 347, 351(8). Nevertheless, it was only when decedent came into such a position and defendant became chargeable with notice of his peril, that the doctrine seized upon the situation and imposed upon defendant the duty to thereafter exercise proper care to avoid the threatened injury. When, if ever, defendant became chargeable with notice of decedent's peril, depended upon the reasonable appearances of the situation confronting her [Lane v. Wilson, Mo.App., 390 S.W.2d 943, 947 (5)], and defendant's duty to avert the impending injury did not arise until she knew or should have known decedent was in immediate danger. Davis v. St. Louis Public Service Company, Mo., 316 S.W.2d 494, 497(6). Of course, the mere fact the accident occurred makes it self-evident that decedent was at some time in a position acute with perilous possibilities. But such a fact is not alone proof of the position of the parties at any given time. There was no direct or circumstantial evidence from which the jury, without speculating, could determine the location, speed (if any) or direction of movement of the Camaro when defendant's automobile was at any given point. Also, short of conjecture, the jury could not determine if defendant could or should have seen decedent when he came into a position of immediate danger; neither could the jury, without guessing, ascertain the time when and the place where the reasonable appearances of the situation were such as to impose upon defendant a duty to act. Finch v. Kegevic, Mo.App., 486 S.W.2d 515, 520–521(8, 9).

The judgment for defendant is affirmed.

STONE, HOGAN and BILLINGS, JJ., and DOUGLAS W. GREENE, Special Judge, concur.