Ernest BLAND, Plaintiff-Respondent,

v.

IMCO RECYCLING, INC. and Metal Mark, Inc., Defendants-Appellants.

No. 23703.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 30, 2002.

T. Michael Ward, Brown & James, P.C., St. Louis, for appellants.

John L. Cook, Thomasson, Gilbert, Cook & Maguire, L.C., Cape Girardeau, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

On August 6, 2001, this court issued an opinion in this cause. On October 23, 2001, by order of the Supreme Court of Missouri, this cause was transferred to that court. On January 22, 2002, the Supreme Court entered an order retransferring the cause to this court. The original opinion of this court, which follows, is now readopted and reissued.

A jury awarded Plaintiff Ernest Bland ("Plaintiff") a judgment of four million dollars against Metal Mark, Inc. ("Metal

Mark") and IMCO Recycling, Inc. ("IMCO") for personal injuries Plaintiff sustained in a furnace explosion at an aluminum processing plant in Sikeston, Missouri. Metal Mark was assessed forty percent of the fault and IMCO was assessed sixty percent of the fault. Judgment was entered consistent with the verdict. Both defendants appeal.

## I. The Facts

On January 12, 1997, Plaintiff was working at an aluminum processing plant. As part of his job duties he used a forklift to put in a long pole to rake material in a furnace. After Plaintiff backed the forklift away, another employee rotated the furnace. An explosion occurred when the molten aluminum was expelled from a furnace that had no guards, shields, or doors on it. Plaintiff suffered third-degree burns when the molten aluminum hit him and caught his clothing on fire. He required skin grafts and was hospitalized in a burn unit for approximately three months.

Marnor Aluminum Processing, Inc. ("Marnor") hired Plaintiff in May 1996. At that time Marnor was a wholly-owned subsidiary corporation of Metal Mark, one of the two appellants in this case. Metal Mark was a wholly-owned subsidiary corporation of IMCO Recycling of Illinois Inc. IMCO Recycling of Illinois Inc. was a wholly-owned subsidiary of IMCO, the second defendant in this case. IMCO is a Delaware corporation with its principal place of business in Texas. On March 31, 1998, IMCO Recycling of Illinois Inc. merged into IMCO.

On June 3, 1996, Marnor filed a certificate of merger in the State of Illinois.[1] The document states in pertinent part:

RESOLVED, that, effective as of June 1, 1996 for accounting purposes only, Subsidiaries merge (the "Merger") with and into Parent, and Parent shall be the surviving corporation (the "Surviving Corporation") pursuant to the Illinois Business Corporation Act of 1983. . . .

Marnor was one of the "Subsidiaries"; Metal Mark was the "Parent" and the surviving corporation.

On June 4, 1997 Plaintiff brought a workers' compensation claim naming Marnor as his employer. On June 11, 1997, Marnor filed an answer as Plaintiff's employer. From that date until the date of trial of the personal injury lawsuit Marnor defended Plaintiff's workers' compensation case. On February 23, 2000, while testimony was still being taken in the personal injury trial, Metal Mark filed an amended answer in the workers' compensation case claiming to be Plaintiff's employer. Other relevant facts will be set forth in the discussion below.

## II. Issues

Both defendants raise the issue of subject matter jurisdiction. Specifically, both defendants claim that the exclusive remedy for Plaintiff's claim rests with the Missouri Division of Labor and Industrial Relations. Metal Mark claims to be the actual employer of Plaintiff who was injured in the scope and course of his employment. IMCO claims, as an alternative point relied on, that as the alter ego of Metal Mark, it is entitled to the same immunity. Additionally, IMCO claims that the trial court lacked personal jurisdiction over it. Finally, IMCO challenges the judgment on the basis that Plaintiff failed to make a submissible case against IMCO.

1. Two other corporations not relevant to this appeal also merged into Metal Mark at the same time: Columbia Aluminum Recycling, Inc. (an Illinois corporation) and Tropram, Inc. (an Indiana corporation).

### A. Personal Jurisdiction over IMCO

IMCO complains that the trial judge erred in failing to dismiss Plaintiff's suit for lack of personal jurisdiction over IMCO. IMCO argues that there are insufficient contacts between itself and Missouri to justify it being haled into court in Missouri. Specifically, IMCO claims:

> II. The trial court erred in denying IMCO Recycling, Inc.'s motion to dismiss for lack of personal jurisdiction because the trial court lacked personal jurisdiction over IMCO Recycling, Inc., in that:
>
> A. IMCO Recycling, Inc., did not commit one of the predicate acts enumerated in Missouri's long-arm statute necessary to subject IMCO Recycling, Inc., to personal jurisdiction in Missouri; and
>
> B. IMCO Recycling, Inc., did not have sufficient minimum contacts with Missouri to satisfy the due process requirements of the fourteenth amendment of the United States Constitution for the imposition of personal jurisdiction.

We disagree.

### 1. Standard of Review

The party alleging in personam jurisdiction has the burden of making a prima facie showing that the trial court has jurisdiction. *Farris v. Boyke*, 936 S.W.2d 197, 200 (Mo.App. S.D.1996). The trial court's conclusion as to personal jurisdiction is one of law. *Stavrides v. Zerjav*, 848 S.W.2d 523, 527 (Mo.App. E.D.1993).

In reviewing a motion to dismiss, we are mindful that necessary factual determinations are within the sole discretion of the trial judge. *Chromalloy American Corporation v. Elyria Foundry Company*, 955 S.W.2d 1, 5 (Mo. banc 1997). To analyze whether the trial court abused its discretion in making its finding, an appellate court must view the evidence in the light most favorable to the trial court's ruling. *Anglim v. Missouri Pacific Railroad Company*, 832 S.W.2d 298, 303 (Mo. banc 1992). Discretionary rulings are presumed correct and the appellant bears the burden of showing an abuse of that discretion. *Id.* Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances presented to the court and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.*

If reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.* This court will defer to the trial court's findings and will presume that the factual issues were resolved by the trial court in accordance with the result reached. *Smith-Scharff Paper Company, Inc. v. Blum*, 813 S.W.2d 27, 28 (Mo.App. E.D.1991).

### 2. Waiver

We need not address IMCO's claims concerning the long-arm statute and minimum contacts as IMCO waived its right to contest personal jurisdiction by seeking affirmative relief from the trial court against an employee of Marnor. The trial court concluded correctly that, as a matter of law, the court had personal jurisdiction over IMCO.

IMCO filed a cross-claim against co-employee, Max Sweet.[2] IMCO alleged that

---

**2.** Five defendants filed an answer and cross-claim, of which IMCO was one. We refer to IMCO as the party filing the answer and cross-claim for purposes of discussion of this point only because IMCO is the only defen-

Plaintiff's injuries were caused by Sweet. It alleged that IMCO had a right of contribution from Sweet if IMCO was found liable to Plaintiff. IMCO concluded its cross-claim as follows: "WHEREFORE, Defendants pray this court for a cross-claim for indemnity and contribution from Defendant Sweet...."

 The general principle is that if a party takes any action which recognizes that the cause is in court and assumes an attitude that the jurisdiction of the court has been acquired, he is bound thereby, and the action amounts to a general appearance. *In re Estate of Miller*, 9 S.W.3d 760, 767 (Mo.App. S.D.2000) (quoting *State ex rel. Sperandio v. Clymer*, 581 S.W.2d 377, 384 (Mo. banc 1979)). If a party acts so as to recognize that a cause of action is pending and then takes steps that are clearly inconsistent with a lack of personal jurisdiction, the party waives his claim of lack of personal jurisdiction. *Lamastus v. Lamastus*, 886 S.W.2d 721, 725 (Mo.App. E.D.1994). If a party affirmatively seeks relief, he necessarily assumes the attitude that the jurisdiction of the court has been acquired. *Germanese v. Champlin*, 540 S.W.2d 109, 112 (Mo.App.1976). Waiver occurs by the defendants "taking or agreeing to some step or proceeding in the cause beneficial to himself ... other than one contesting only the jurisdiction." *Abrams v. Four Seasons Lakesites/Chase Resorts, Inc.*, 904 S.W.2d 37, 39 (Mo.App. S.D.1995) (internal citations omitted).

IMCO argues that *Sperandio* and *Germanese* have no precedential value on the issue of waiver because of the Missouri Supreme Court's decision in *State ex rel. White v. Marsh*, 646 S.W.2d 357 (Mo.banc 1983). In *White* our Supreme Court held that a request for additional time to respond to the petition did not waive the

right to forward a subsequent motion to dismiss for lack of jurisdiction over the person or to dismiss for insufficiency of process. *Id.* at 362. In *White* the Court specifically stated, "We do not consider situations in which a defendant takes steps in a case which are clearly inconsistent with any claim of want of personal jurisdiction." *Id.* IMCO took such steps in this case. *White* does not aid IMCO's argument.

The procedural history of this case illustrates a reason for the waiver rule. A broadly drafted motion to dismiss was filed on behalf of IMCO. IMCO filed a cross-claim against another defendant and refused to dismiss that defendant even after Plaintiff dismissed his claim against that defendant. Finally, IMCO made no record of a claim of lack of personal jurisdiction until the third day of a jury trial. On the first day of trial absolutely nothing was mentioned to the court about a lack of personal jurisdiction. This is so despite the fact that other claims in IMCO's motion to dismiss were argued that day. On the second day of trial IMCO raised the question of personal jurisdiction after it filed a motion for directed verdict. The basis for its argument, however, was invalid service, not a lack of sufficient contacts with Missouri, the claim of error made on this appeal. Finally, on the last day of trial, IMCO raised the issue of long-arm jurisdiction and due process in terms of a supposed lack of personal jurisdiction. In such a situation we have no difficulty holding that the trial court did not err in refusing to dismiss for lack of personal jurisdiction based on the waiver of IMCO in filing the cross-claim. IMCO's point is denied.

### B. Subject Matter Jurisdiction

The court found that Marnor was Plaintiff's employer and, therefore, entitled to

dant alleging lack of personal jurisdiction on appeal.

immunity under § 287.120.2.[3] The trial court overruled motions to dismiss IMCO and Metal Mark for lack of subject matter jurisdiction. Appellants now challenge that ruling.

*1. Standard of Review*

A lawsuit should be dismissed whenever it "appears" that the trial court lacks subject matter jurisdiction. *State ex rel. Jones Construction Company v. Sanders,* 875 S.W.2d 154, 157 (Mo.App. E.D. 1994); Supreme Court Rule 55.27(g)(3) (2001). The initial burden to show that the trial court lacked jurisdiction is on the movant. *Shaver v. First Union Realty Management, Inc.,* 713 S.W.2d 297, 299 (Mo.App. S.D.1986). The party raising the defense must show by a preponderance of evidence that the court lacks jurisdiction. *Sanders,* 875 S.W.2d at 157. This court must sustain the trial court's finding that it had subject matter jurisdiction unless the trial court abused its discretion. *James v. Union Electric,* 978 S.W.2d 372, 374 (Mo. App. E.D.1998). With these standards in mind we turn to the specific arguments of Metal Mark and IMCO relating to the issue of subject matter jurisdiction.

*2. Metal Mark*

Metal Mark's first point on appeal is as follows:

> I. The trial court erred in denying Metal Mark, Inc.'s motion to dismiss for lack of subject matter jurisdiction because the trial court lacked subject matter jurisdiction over Metal Mark, Inc., in that exclusive jurisdiction over Plaintiff's claim against Metal Mark, Inc., rested with the Missouri Division of Labor and Industrial Relations as Metal Mark, Inc., was Plaintiff's employer at the time Plaintiff was in-

sured in the scope and course of his employment.

Metal Mark argues that the judgment against it should be reversed because Metal Mark was, by virtue of the merger of June 3, 1996, the actual employer of Plaintiff. If Metal Mark was the actual employer, then Metal Mark was immune from liability other than Plaintiff pursuing a workers' compensation claim pursuant to § 287.120.

Plaintiff argues that the trial court was correct in finding that the preponderance of the evidence shows that Marnor, not Metal Mark, was the actual employer of Plaintiff at the time of the injury. Specifically, Plaintiff argues that the following evidence supports the trial court's finding: (1) Metal Mark admitted Marnor was the employer in the original answer to the workers' compensation case and defended the workers' compensation claim until the trial of the personal injury suit; (2) Metal Mark failed to address the issue of subject matter jurisdiction prior to the morning of trial; and (3) the merger document could be construed to indicate the merger of Marnor and Metal Mark was for accounting purposes only.

It is correct that Marnor, and not Metal Mark, defended the workers' compensation case for two years and eight months from the first filing until after the trial in the personal injury lawsuit commenced. Metal Mark did not file an amended answer in the workers' compensation claim until after the claims against Marnor were dismissed in the civil litigation. Even accepting the workers' compensation pleadings as an admission against interest does not provide a conclusive finding that Marnor, and not Metal Mark, was Plaintiff's employer.

---

**3.** All references to statutes are to RSMo 2000, unless otherwise indicated.

Plaintiff is also correct that Metal Mark failed to address the issue of subject matter jurisdiction prior to the morning of trial; however, Metal Mark did raise the issue of subject matter jurisdiction in its answer to the amended petition and in the motion to dismiss. Although we do not condone the tactics of defense counsel of failing to provide evidence to the court supporting the motion and failing to seek a ruling from the court on the issue, we find that such behavior does not assist Plaintiff on the issue of whether the court had subject matter jurisdiction in this particular case.

Lastly, in support of the trial court's ruling in favor of subject matter jurisdiction, Plaintiff claims the language in the merger document itself was ambiguous and cast doubt on the existence of a complete merger between Marnor and Metal Mark. The merger document stated, "that, effective as of June 1, 1996 for accounting purposes only, Subsidiaries merge (the 'Merger') with and into Parent, and Parent shall be the surviving corporation (the 'Surviving Corporation')...." Plaintiff argues this language could be read to mean that the merger was for accounting purposes only.

No evidence was presented concerning the meaning of this language. The record concerning the completeness of the merger between Metal Mark and Marnor provided to the trial court was less than clear; however, as a matter of law, the only evidence presented to the court indicates that Metal Mark was the only corporation in existence at the time of the injury.[4] Therefore, on the date of the injury, Metal Mark was the actual employer of Plaintiff and thus exclusive jurisdiction rested with the Missouri Division of Labor Industrial Relations.

Metal Mark's point is well-taken. The trial court abused its discretion in denying Metal Mark's motion to dismiss for lack of subject matter jurisdiction.

### 3. IMCO

■ Like Metal Mark, IMCO complains that the trial court lacked subject matter jurisdiction over it. The point reads as follows:

III. In the alternative and in the event the court holds that IMCO Recycling, Inc., is subject to personal jurisdiction in Missouri because it is the alter ego of Metal Mark, Inc., its subsidiary, which IMCO Recycling, Inc., denies, the trial court erred in denying IMCO Recycling, Inc.'s motion for dismissal for lack of subject matter jurisdiction because the trial court lacked subject matter jurisdiction over IMCO Recycling, Inc., in that exclusive jurisdiction over Plaintiff's claim against IMCO Recycling, Inc., rested with the Missouri Division of Labor and Industrial Relations as IMCO Recycling, Inc., as Metal Mark, Inc.'s alter ego, was Plaintiff's employer at the time Plaintiff was injured in the scope and course of his employment.

■ IMCO's argument hinges on a finding by this court in the previous point raised by IMCO concerning personal jurisdiction that IMCO is the alter ego of Metal Mark. As set forth above, the basis for personal jurisdiction over IMCO is not an alter ego theory. The scope of our review is limited to the issues raised in IMCO's point relied on. *In re Marriage of Caby,* 825 S.W.2d 56, 61 (Mo.App. S.D.1992). Be-

---

4. The effective date of a merger of foreign corporations under Missouri law is the date when the merger becomes effective in the state of domicile of such surviving or new corporation. § 351.458.4.

cause we did not find IMCO was subject to personal jurisdiction in Missouri because it was the alter ego of Metal Mark, IMCO's point relied on presents us with nothing to review. In addition, IMCO argued that it was not Plaintiff's employer during the trial. IMCO cannot take a position on appeal contrary to the position it took at trial. *Olson v. Christian County*, 952 S.W.2d 736, 742 (Mo.App. S.D.1997). Point denied.

### C. Submissible Case

For its final point, IMCO contends:

IV. In the alternative and in the event the court holds that the trial court possessed both personal and subject matter jurisdiction over IMCO Recycling, Inc., which IMCO Recycling, Inc., denies, the trial court erred in denying IMCO Recycling, Inc.'s motion for judgment notwithstanding the verdict because Plaintiff failed to make a submissible case against IMCO Recycling, Inc., for the negligent supply of dangerous instrumentality in that Plaintiff failed to establish the following two essential elements of his cause of action:

A. That IMCO Recycling, Inc., supplied a dangerous instrumentality; and

B. That IMCO Recycling, Inc., knew or should [5] have known that the furnace contained no guards, shields, or doors or that the furnace was, in fact, delivered to the Marnor Plant without guards, shields, or doors.

---

**5.** The verdict director submitted in this case, M.A.I. 25.10(B), used the word "could" rather than "should." The Committee Comment to MAI 25.10(B) states that the 1995 Revision to this instruction changed the phrase "should have known" to "could have known" on the issue of constructive notice. The committee noted that questions had arisen as to whether "should have known" imposed a higher burden than "could have known." That issue is not before us. We use the standard used in the verdict director in this case, "could have known."

### 1. Standard of Review

A judgment notwithstanding the verdict ("JNOV") is appropriate only if a party fails to make a submissible case. *Balke v. Central Missouri Electric Cooperative*, 966 S.W.2d 15, 20 (Mo.App. W.D. 1997). In reviewing whether the appellant made a submissible case, this court views the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff's case and disregards all evidence to the contrary. *Id.* A judgment notwithstanding the verdict should be granted only if reasonable persons could not differ as to the outcome of the case. *Id.* The reviewing court will reverse the jury's verdict on the basis of insufficient evidence only where there is a "complete absence of probative fact" to support the jury's conclusion. *Seitz v. Lemay Bank and Trust Company*, 959 S.W.2d 458, 461 (Mo. banc 1998). This court defers to the jury's role of judging the weight of the evidence and the credibility of witnesses. *Cotner Productions, Inc. v. Snadon*, 990 S.W.2d 92, 98 (Mo.App. S.D.1999). The jury is the sole judge of the credibility of the witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony. *Gatley v. Wal-Mart Stores, Inc.*, 16 S.W.3d 711, 713 (Mo.App. S.D.2000).

### 2. Requirements for a Submissible Case

MAI 25.10(B) (5th edition) gives the elements of "Negligently Supplying Dangerous Instrumentality for Supplier's Business Purposes":

1) the defendant supplied the dangerous instrumentality for use; and

2) the dangerous instrumentality had a defect or hazard, and was therefore dangerous when put to a reasonably expected use; and

3) the dangerous instrumentality was put to a reasonably expected use; and

4) the defendant knew, or in the exercise of reasonable care could have known of the dangerous condition; and

5) defendant failed to exercise ordinary to either make the condition reasonably safe or adequately warn of it; and

6) as a direct result of such failure, plaintiff sustained damage.

IMCO claims Plaintiff did not make a submissible case on the first and fourth elements. The trial court denied the motion for a directed verdict. With the principles set forth above to guide us, we turn to IMCO's final point.

*a. Supplying a Dangerous Instrumentality*

█ The first element requires that the defendant supplied the dangerous instrumentality for use. Sections 388 and 392 of the Restatement (Second) of Torts address the topic of negligently supplying a dangerous instrumentality. Comment "c" of § 388, which also applies to § 392, provides that a person is a "supplier" who "for any purpose or in any manner gives possession of a chattel for another's use." Ownership of the chattel is immaterial. Restatement (Second) of Torts, § 392, comment c (1965). It is enough that the entity has supplied the chattel for use in its business. *Id. See also Ridenhour v. Colson Caster Corp.*, 687 S.W.2d 938, 943 (Mo.App. S.D.1985).

█ Viewing the evidence and all the reasonable inferences therefrom in the light most favorable to the plaintiff's case and disregarding all evidence to the contrary, we find that evidence supported a finding that IMCO was a supplier of a dangerous instrumentality for a business purpose. Specifically, according to the corporate record keeper of IMCO, Jeffrey Mecom, IMCO directly owned and operated an aluminum plant in Sapulpa, Oklahoma. IMCO has owned that plant since its formation in 1988. IMCO and its subsidiaries recycle, process alloys, aluminum, magnesium and zinc. On October 1, 1995, Metal Mark, which already owned Pittsburg Aluminum, was purchased by IMCO Recycling of Illinois Inc., a wholly-owned subsidiary of the defendant, IMCO.

Jonathan Markle testified that he was an employee of Metal Mark from 1981 until the sale to IMCO in 1995; commencing in 1995, he became the president of the Metal Mark division of IMCO Recycling of Illinois Inc. According to Markle, as a result of the merger of 1995, the decision was made to shut down the Pittsburg location because it was viewed as a duplicate location. It no longer served a purpose within the IMCO organization. He further testified the decision to shut down the Pittsburg was made by the management of IMCO. He said the decision to transfer the furnace was made by himself "in coordination with Dallas." The furnace and some furnace related items were then transferred from the Pittsburg plant to the Marnor plant.

Markle testified he was accountable and responsible to IMCO Recycling, Inc. in Dallas for the performance of Metal Mark; he typically talked to IMCO in Dallas about major decisions. He suggested to "Dallas" that they replace two furnaces being used at the Marnor plant with the one furnace from Pittsburg. He believed that would either maintain, or possibly increase, production at the Marnor plant. The main issue considered by management was trying to utilize assets of the company

to the best benefit of the company. Therefore, at IMCO and Markle's direction the furnace was moved to the Marnor plant.

Paul DuFor, the executive vice president and chief financial officer for IMCO, testified to IMCO's involvement in the placing of the furnace in the Marnor plant. He stated the decision to close Pittsburg was made by IMCO about the time that IMCO was acquiring Metal Mark. He testified IMCO has a facility in Sapulpa, Oklahoma that was not that far from Pittsburg, Kansas. It was not economical to operate the two plants located so closely together. He stated that the decision to close the Pittsburg plant was made in discussions between the officers of IMCO at that time, however, the officers of Metal Mark did not have anything to say about it.

The key uncontroverted fact is that IMCO Recycling of Illinois Inc. has never had Dallas as its primary place of business nor was there any testimony that any management personnel for IMCO Recycling of Illinois Inc. ever resided in Dallas. Markle was clear that the IMCO he was referring to was the IMCO with management in Dallas and that the decision to shut down Pittsburg was made because it was a duplicate location to the plant in Sapulpa, Oklahoma. DuFor confirmed that the decision to close Pittsburg was made by management at the time that IMCO was acquiring Metal Mark. Mecom identified the Sapulpa plant as directly owned and operated by IMCO. The only reasonable inference from the testimony is that after the merger of 1995 the management of IMCO (in Dallas) viewed the Sapulpa and Pittsburg facilities as duplicative and made the decision to transfer the furnace from Pittsburg, Kansas to Sikeston, Missouri. IMCO Recycling of Illinois Inc has never had any interest in the plant in Sapulpa, Oklahoma. IMCO Recycling of Illinois Inc. could not have made the decision that the Sapulpa plant duplicated any of its facilities.

Therefore, we cannot say there was a complete absence of probative fact supporting the finding that IMCO made the decision to transfer the defective furnace to Missouri. Rather, evidence supported a finding that IMCO supplied the furnace for Marnor to use. The use of the furnace is one in which IMCO has a business interest, and, as such, IMCO supplied a dangerous instrumentality for use of another pursuant to § 392 of the Restatement.

## b. Knowledge

 Finally, IMCO claims that there was not sufficient evidence indicating it knew or could have known that it was supplying a dangerous instrumentality if it had used reasonable care. IMCO concedes that the furnace being without guards, shields, or doors is a dangerous instrumentality. The furnace was sent to Marnor without guards, shields, and doors. Sweet, Plaintiff's co-worker, testified that no doors were on the furnace the day the accident occurred. Material had been ejected from that very furnace in the presence of plant managers in the past. This is called a "blowout." Fireproof overalls were issued to employees to protect against molten aluminum burns.

Plaintiff's expert testified to the cause of the explosion that injured Plaintiff. He explained that blowouts were a known risk in the industry. In all the aluminum plants the expert inspected, doors were put on the furnaces, or a shield is put up, to prevent the molten material from spewing out. From all of this evidence the jury could have found that IMCO, knew or could have known of the dangerous condition of the furnace that burned Plaintiff.

### III. Conclusion

■ The judgment against Metal Mark is reversed. Plaintiff's damages are fixed at $4,000,000 as a result of the jury's verdict at trial. *See Kibbons v. Union Electric Co.*, 823 S.W.2d 485, 492 (Mo. banc 1992); *McHaffie v. Bunch*, 891 S.W.2d 822, 828 (Mo. banc 1995). There was no allegation or submission of fault on the part of Plaintiff. Accordingly, because IMCO is the lone remaining defendant, IMCO is solely liable for Plaintiff's injuries. *See Teeter v. Missouri Highway and Transp. Com'n*, 891 S.W.2d 817, 821 (Mo. banc 1995); *Kibbons* at 491. The cause is remanded with directions to enter a judgment, as modified herein, in favor of Plaintiff and against IMCO in conformity with this opinion.

BARNEY, C.J., concurs.

GARRISON, J., dissents in separate opinion filed.

PHILLIP R. GARRISON, Judge, dissenting.

I concur in the result reached in the principal opinion except as it relates to the issue of whether a submissible case was made against IMCO Recycling, Inc. ("IMCO Recycling"). I believe that it was not, and respectfully dissent from that portion of the opinion holding otherwise.

Prior to October 1, 1995, Pittsburg Aluminum, Inc. ("Pittsburg") and Marnor Aluminum Processing, Inc. ("Marnor") were wholly owned subsidiaries of Metal Mark, Inc. ("Metal Mark") which was, in turn, a wholly owned subsidiary of Alumar, Inc.

("Alumar"). On that date Alumar merged with IMCO Recycling of Illinois, Inc. ("IMCO of Ill."), the wholly owned subsidiary of IMCO Recycling. Consequently, Metal Mark became the wholly owned subsidiary of IMCO of Ill. On June 3, 1996, Marnor merged with Metal Mark, which was the surviving corporation.

The principal opinion refers to the decision to close the Pittsburg plant that had been operated in Pittsburg, Kansas by Pittsburg. That decision was made at some point after Alumar merged with IMCO of Ill. According to the president of Metal Mark, Jonathan Markle, that decision was made by the "management of IMCO." At that time, however, there were two corporate entities that could have been known as IMCO, i.e., IMCO Recycling and IMCO of Ill. Mr. Markle did not specify which IMCO he was referring to. The same was true of Mr. DuFor, who said that the decision to close the Pittsburg plant was made by the management of IMCO Recycling. This could have referred to IMCO Recycling, Inc. or IMCO Recycling of Illinois, Inc.[1] None of this testimony, however, specifically or necessarily dealt with the later decision to move the furnace to the Marnor plant in Sikeston.

Mr. Markle also said that when the Pittsburg plant was closed "we decided to move the plant--move the furnace to Sikeston to hold it there." When asked who "we" was, he said "[t]he we was myself in coordination with Dallas." He explained that at that time, Metal Mark, which was the parent corporation of Pittsburg, was

---

1. It is stated in the principal opinion that IMCO of Ill. never had its primary place of business or management personnel in Dallas. This apparently refers to testimony by Mr. Markle, referred to *infra*, that he made the decision to transfer the furnace "in coordination with Dallas." There was no evidence about whether IMCO of Ill. had an office or management personnel in Dallas. As indicated *infra*, the burden of proof was on Plaintiffs. In any event, Mr. Markle's testimony ("in coordination with Dallas") was in response to questions about the transfer of the furnace and not the decision to close the Pittsburg plant. The decision to close the Pittsburg plant is not, in my view, determinative of who "supplied" the furnace to the Marnor plant in Sikeston.

the wholly-owned subsidiary of IMCO Recycling in Dallas;[2] that he was accountable and responsible to IMCO Recycling in Dallas for the performance of Metal Mark; and that when he made major capital decisions, he typically talked with them about "yes or no." In this instance, he said that he suggested to them that it would be appropriate to move that furnace.

First, I believe that this testimony was insufficient to permit the trier of fact to determine the extent, if any, of IMCO Recycling's involvement in the decision to move the furnace. While IMCO Recycling acknowledges in its brief that the reference to "Dallas" in Mr. Markle's testimony that he made the decision "in coordination with Dallas" refers to "presumably ... someone at IMCO Recycling, Inc." there is no indication about what "coordination" meant. Mr. Markle did not explain what he meant by that phrase. In particular, there is no indication whether he merely consulted with "Dallas"; whether he made the decision and told "Dallas" about it later; whether "Dallas" merely consented to a decision he had made as president of Metal Mark; whether he asked for and received authority from "Dallas" for permission to move the furnace, and if so whether the person consulted had authority from IMCO Recycling to make such a decision; or whether he was told by someone at "Dallas" to move the furnace, and if so, if that person had authority to do so. While Mr. Markle may have "talked" to IMCO Recycling about major capital decisions, there is no indication that it made the ultimate decision or that this situation was one that would fit in that category. The fact that he suggested to IMCO Recycling that it would be appropriate to move the furnace does not necessarily indicate that

IMCO Recycling was the supplier. In fact, Mr. Mecom, who is corporate counsel and keeps all the corporate records of IMCO Recycling and its subsidiaries, said that "in general [Mr. Markle] would keep people in like operating side [sic] of the business in Dallas informed of what he was doing."

To reach the conclusion espoused by Plaintiff that IMCO Recycling supplied the furnace requires the inference from Mr. Markle's testimony that IMCO Recycling made the decision and directed that the furnace be moved to Marnor. As indicated above, that testimony is susceptible to several equally plausible conclusions, some of which would indicate that IMCO Recycling directed the move of the furnace, and some that it did not.

Plaintiff had the burden of proving all facts and circumstances essential to submission of the negligence charged. *Michaud v. Burlingame*, 490 S.W.2d 680, 684 (Mo.App.Spfd.1973). A case is not to be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence. *Shackelford v. West Central Elec. Co-op., Inc.*, 674 S.W.2d 58, 63 (Mo.App. W.D.1984). In determining whether a submissible case is made, we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff's case and disregard all evidence to the contrary. *Bond v. California Comp. and Fire Co.*, 963 S.W.2d 692, 696 (Mo.App. W.D.1998). Each and every element essential to establish liability must be supported by substantial evidence. *Id.* Substantial evidence is competent evidence from which a trier of fact can reasonably decide the case. *Id.* No fact essential to submissibility can be inferred in the absence of a substantial evidentiary basis. *Schubiner v. Oppenheimer Indus., Inc.*,

**2.** Under the undisputed facts here, Metal Mark was the wholly owned subsidiary of

IMCO of Ill.

675 S.W.2d 63, 78 (Mo.App. W.D.1984). A plaintiff can carry his burden by circumstantial evidence, which is broadly defined as "evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *Bridgeforth v. Proffitt,* 490 S.W.2d 416, 422 (Mo.App.Spfd.1973). Liability, however, cannot rest on guesswork, conjecture, or speculation beyond inferences that can reasonably decide the case. *Mathis v. Jones Store Co.,* 952 S.W.2d 360, 366 (Mo.App. W.D.1997); *Bond,* 963 S.W.2d at 696; *Schubiner,* 675 S.W.2d at 78. An inference is a logical a priori conclusion drawn by reason from proven or admitted facts. *Wright v. Over-The-Road,* 945 S.W.2d 481, 495 (Mo.App. W.D.1997). It is more than, and cannot be predicated on, mere surmise or conjecture. *Id.* It is not a possibility that a thing could have happened or an idea founded on probability that a thing may have occurred. *Id.* While we liberally view the legitimacy of inferences in the plaintiff's favor, such liberal view does not include speculative free leaps to the desired inference. *Id.* "If two or more inferences may be deducted of equal reasonableness, then there is no inference that may be indulged without mere speculation." *Id. See also Mathis,* 952 S.W.2d at 360("We will not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences."); *Hurlock v. Park Lane Med. Ctr., Inc.,* 709 S.W.2d 872, 880 (Mo.App. W.D. 1985)("where evidence equally supporting two inconsistent and contradictory factual inferences as to ultimate and determinative facts is solely relied on to make a submissible case, there is a failure of proof as the case has not been removed from the tenuous status of speculation, conjecture and surmise."). The determination of whether or not there is sufficient evidence to submit an issue to the jury is a legal question and not an exercise of judicial discretion. *Shackelford,* 674 S.W.2d at 63. Consequently, such a determination is a judicial function. *Hurlock,* 709 S.W.2d at 880; *Rossmann v. G.F.C. Corp.,* 596 S.W.2d 469, 472-73 (Mo.App. E.D.1980).

In this case I believe, from the sparse evidence presented, that Plaintiff presented insufficient evidence concerning the extent of IMCO Recycling's involvement in the decision to move the furnace to the Marnor plant in Sikeston to remove it from the realm of speculation, surmise, guesswork, and conjecture. Concurrently with that conclusion, I believe that the evidence was insufficient to establish that IMCO Recycling was a "supplier" of the furnace, one of the necessary elements of Plaintiff's case. This furnace belonged to Pittsburg, which was a wholly owned subsidiary of Metal Mark, which was a wholly owned subsidiary of IMCO of Ill., which was a wholly owned subsidiary of IMCO Recycling. IMCO Recycling was three corporate entities removed from Pittsburg, the owner of the furnace. The fact that IMCO Recycling owned the stock of IMCO of Ill., which owned the stock of Metal Mark, which owned the stock of Pittsburg is, in itself, insufficient to establish that IMCO Recycling supplied the furnace to the Marnor plant. Generally, two different corporations are treated as two different persons, even if one corporation is the sole shareholder of the other. *Hefner v. Dausmann,* 996 S.W.2d 660, 664 (Mo.App. S.D. 1999). A parent corporation is not responsible for the acts of its subsidiary except where the wronged party pierces the corporate veil. *Id.* "Two separate corporations may be treated as one only where there is such dominion and control that the controlled corporation has no separate mind, will or existence of its own and is but an alter ego for its principal. Such dominion and control must be established by evidence, and is not presumed." *Id.* Absent

evidence that the controlled corporation has no separate mind, will or existence of its own, the parent corporation is not liable for the acts of the subsidiary. *Id.* No attempt was made in the instant case to establish that Metal Mark or Pittsburg was the alter egos of IMCO Recycling.

The issue of who qualifies as a "supplier" in a negligence action for supplying a dangerous instrumentality has surprisingly received little reported judicial attention beyond the obvious cases involving an immediate seller, lessor, donor, or lender. Section 388 of the Restatement (Second) of Torts (1965) concerns liability of "[o]ne who supplies directly or through a third person a chattel . . . " Similar language appears in Section 392 entitled "Chattel Dangerous for Intended Use." Comment c of Section 388 is titled "Persons included as 'suppliers' " and references "any person who for any purpose or in any manner gives possession of a chattel for another's use." It also says that "[t]hese rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person. They apply to all kinds of bailors, . . ." Restatement (Second) of Torts Section 388, Comment c (1965). The principal opinion correctly notes that Comment c to Section 392 is titled "Ownership of chattel immaterial," but it should be noted that the comment proceeds to say:

> In order that the rule stated in this Section shall apply, it is not necessary that the chattel be owned by the one who supplies it. It may be leased to him or borrowed by him. It is enough that he has had possession or control of it for the purpose of using it in connection with his business, and that he has supplied it for such purpose. . . .

In the instant case, the furnace was owned and possessed by Pittsburg, an entity separate from IMCO Recycling.[3] There is no evidence that IMCO Recycling ever had possession of it, or, for that matter, that it had ever been seen by one of its employees. In fact, Mr. Mecom testified that IMCO Recycling never had possession of the furnace and that it was supplied to the Marner facility by Pittsburg. This is consistent with the bill of lading showing Pittsburg as the shipper.

Is the possibility that IMCO Recycling may have concurred in a decision made by the president of one of its subsidiaries to deliver the furnace to the Marnor plant sufficient to impose liability on IMCO Recycling as a supplier? The same could be asked if IMCO Recycling was merely made aware of the decision. I would not so hold. To do so would impose liability on a parent corporation (a separate entity) under any number of factual scenarios that surely were never intended by the Restatement. It would also ignore the fact that, in the absence of a piercing of the corporate veil, the corporations are separate and distinct. I believe to so hold is an improper application of the concept of "supplier" under the Restatement.

A few cases from other jurisdictions are instructive on this issue. For instance, in *Bloemker v. Detroit Diesel Corp.,* 720 N.E.2d 753, 755 (Ind.App.1999), the issue was whether Detroit Diesel and North Manchester Foundry, Inc. were suppliers under Sections 388 or 392 of the Restatement (Second). Detroit Diesel owned a pattern (a master model used to make a mold into which molten iron is poured to form a casting). While making modifications to a pattern, it exploded and injured the plaintiff. The pattern was owned by Detroit

---

**3.** Although the Pittsburg plant was closed, there was evidence indicating that Pittsburg

Aluminum, Inc. may still be in existence.

Diesel but was in the possession of North Manchester. When Detroit Diesel needed the product created through use of the pattern, it would contact its supplier, who, in turn, would contact North Manchester. North Manchester would make the product and deliver it to Detroit Diesel's supplier, which would perform finish work on the product before delivering it to Detroit Diesel. Detroit Diesel's supplier, without Detroit Diesel's knowledge, requested plaintiff's employer to modify the pattern. The plaintiff contended that Detroit Diesel was a supplier because it had control over the pattern, power to exercise and direct authority over it, and power to determine who could use the pattern. *Id.* at 758. The court held that Detroit Diesel was not a "supplier" of the pattern under Sections 388 or 392 of the Restatement (Second) since it was merely a technical owner of the pattern, and never possessed nor maintained control over it. *Id.* at 761.

*Papastathis v. Beall,* 150 Ariz. 279, 723 P.2d 97 (App.1986), is another case involving the application of Section 388 of the Restatement (Second) to determine whether Southland Corp. was a supplier of racks for the display of Coca Cola in "7-11" stores. A can fell from the rack and struck the decedent in the head. It was contended that Southland was a supplier of the racks, which were alleged to be defective, because it had inspected, suggested and endorsed the racks to its franchisees. The racks themselves were owned by Coca Cola and were actually delivered to the franchisees by it. The court held that Southland was not a supplier under the Restatement, saying:

> Since Coca-Cola at all times owned the racks and Coca-Cola gave possession to the franchisee, Southland cannot possibly fit within the above-mentioned categories. Southland's connection to these racks was in inspecting, suggesting and endorsing these racks to its franchises. In effect Southland was the facilitator of

this arrangement. Southland did, however, voluntarily undertake to request that franchisees install the racks in their stores.

*Id.* at 99-100.

Like Southland, under the evidence here, IMCO Recycling may or may not have directed the delivery of the furnace to the Marnor plant. It is just as likely under the evidence, that its only involvement was to receive from Mr. Markle his decision to move the furnace or to consent to his suggestion that it be done. Under that scenario, its involvement could at most be described as a facilitator, something *Papastathis* holds is insufficient.

In *United States v. Page,* 350 F.2d 28, 32-33 (10th Cir.1965), the court refused to hold the United States liable as a supplier of a defective chattel where the government owned the mold in question but never possessed it or exercised control over it. In referring to Section 392 of the Restatement, the court said that "[t]he rule there stated is limited to circumstances where the chattel is 'supplied' by the person sought to be held liable, and was at one time in its control and possession." *Id.* at 33. *See also Dooley v. Parker-Hannifin Corp.,* 817 F.Supp. 245 (D.R.I.1993)(refusing to impose liability on the owner of a defective die which was, and always had been, in the possession of another party where the court noted that the owner did not engage in any transaction remotely resembling a sale, did not place the die in the stream of commerce, and never had possession of the due and was in no position to learn of or guard against any defects); and *White v. Chrysler Corp.,* 421 Mich. 192, 364 N.W.2d 619, 623 (1984).

Based on the above, I would reverse the judgment against IMCO Recycling.