Brenda HEIDRICK, Plaintiff–Appellant,

v.

Harold SMITH and Shirley Smith, Defendants–Respondents.

No. 26197.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 16, 2005.

Abe R. Paul, Pineville, MO, for appellant.

William J. Lasley, Peter J. Lasley, Carthage, MO, for respondents.

JEFFREY W. BATES, Chief Judge.

On June 24, 2001, Brenda Heidrick ("Heidrick") was driving home in her blue 1994 Ford Mustang on Y Highway in Newton County, Missouri. As she approached the farm of Harold and Shirley Smith (hereinafter referred to collectively as "the Smiths" and individually as "Mr. Smith" or "Mrs. Smith"), Heidrick's automobile collided with one of the Smiths' calves that was on the highway. Heidrick's car was damaged in the collision, and she sustained injuries to her neck, shoulder and arm.

In October 2002, Heidrick sued the Smiths. The petition alleged that the Smiths were negligent in permitting their calf to be on the roadway. In the Smiths' answer, they alleged that Heidrick was herself negligent because, *inter alia,* "[s]he failed to keep a careful lookout for objects in front of her . . . ."

In February 2004, the case was tried to a jury. At the Smiths' request and over Heidrick's objection, the trial court decided to give Instruction No. 7, which is set out in full below:

### Instruction No. 7

In your verdict, you must assess a percentage of fault to plaintiff if you believe:

First, plaintiff failed to keep a careful lookout and

Second, plaintiff was thereby negligent and

Third, such negligence of plaintiff directly caused or directly contributed to cause any damage plaintiff may have sustained.

The term "negligent" or "negligence" as used in this instruction means the failure to use the highest degree of care. The phrase "highest degree of care" means that degree of care that a very careful person would use under the same or similar circumstances.

The jury returned a verdict assessing 20% of the fault to the Smiths and 80% of the fault to Heidrick. The jury also determined that Heidrick had sustained total damages of $60,000 for personal injuries and $15,000 for property damage. After the verdict was rendered, however, the trial court reduced Heidrick's award for property damage to $3,000 because the pleadings and proof would not support a larger award. The court entered judgment in Heidrick's favor in the amount of $12,600.

Heidrick has appealed from the judgment. In her sole point relied on, she contends the trial court erred in giving Instruction No. 7 because it was not supported by substantial evidence. Specifically, Heidrick argues there was no credible evidence that she had the time and distance to have seen the calf, reacted to it, and either swerved or stopped in time to avoid the collision.

### I. Standard of Review

It is axiomatic that any issue submitted in an instruction must have evidentiary support; "the submission of any proposition without sufficient evidentiary foundation is error." *Oldaker v. Peters,* 817 S.W.2d 245, 251 (Mo. banc 1991). "Appellate review is conducted in the light most favorable to the submission of the instruction, and if the instruction is supportable by any theory, then its submission is proper." *Id.* at 251–52. Thus, in determining whether Instruction No. 7 should have been submitted, we view the evidence and the reasonable inferences derived therefrom in a light most favorable to the Smiths, who offered the instruction. *Barlett v. Kansas City Southern Ry. Co.,* 854 S.W.2d 396, 399 (Mo. banc 1993); *Maxwell v. City of Hayti,* 985 S.W.2d 920,

922 (Mo.App.1999). We disregard all contrary evidence and inferences. *Oldaker,* 817 S.W.2d at 252; *Maxwell,* 985 S.W.2d at 922. Consequently, we will ignore Heidrick's evidence unless it tends to support the submission of Instruction No. 7. *Riscaldante v. Melton,* 927 S.W.2d 899, 901 (Mo.App.1996). The favorable evidence and inferences bearing on Heidrick's alleged failure to keep a careful lookout are set forth below.

## II. Summary of the Evidence

The Smiths raised beef cattle on 40 acres of land in Newton County, Missouri. Their farm was comprised of two parcels of land, which were divided by Y Highway. In the balance of this opinion, we will refer to these two tracts of land as "the west tract" and "the east tract." The west tract consisted of 10 acres and lay on the west side of the highway. The east tract, which is L-shaped, consisted of 30 acres and lay on the east side of the highway. The portions of the west tract and east tract that abut Y Highway were directly across from one another. Each tract had fenced areas inside which beef cattle were kept.

The west tract contained two residences. The Smiths lived in one residence, which was located on the southern part of the west tract. Their son and daughter-in-law, Travis and Cindy Smith ("Travis" and "Cindy"), lived in another residence, which was located on the northern part of the west tract.[1] The Smiths' other son and daughter-in-law, Tracy and Candy Smith ("Tracy" and "Candy"), lived in a residence located on the east tract. This residence was inside the fenced portion of the east tract. The driveway leading to Tracy's house was equipped with a cattle guard to keep the animals inside the fencing. The driveway leading to the Smiths' residence was located on the opposite side of the highway a short distance south of Tracy's driveway.

An aerial map of the land including and surrounding the Smiths' farm was introduced in evidence. A person traveling south on Y Highway would round a small curve just at the northern boundary of the Smiths' farm. From that point onward, the portion of highway running between the west tract and the east tract ran straight south. As a driver approached Tracy's driveway, there was a small dip in the road. This dip existed because the road sloped gently uphill and traveled though a small depression in the terrain. Thus, a driver traveling south on Y Highway and approaching the Smiths' farm would round the curve, proceed straight south, go over a "little hump" in the road and then continue southward past the Smiths' property.

The trial court admitted a number of photographs showing this hump in the road from vantage points both north and south of its location. These photographs show that the hump was not large enough to obstruct a driver's view of objects the size of a car or a cow on the highway. For example, Exhibit F was taken by a photographer standing well north of the hump in the road and depicts the view looking toward the south. The photograph shows a pickup truck traveling in the northbound lane. The truck is located well south of the hump at a location considerably past Tracy's driveway. All of the truck from its front bumper upwards is visible in the photograph. Thus, the photographs in evidence demonstrate that a person driving an automobile south on Y Highway could see over the top of the little hump in the

---

1. Since several witnesses share the defendants' surname, we will use the witnesses' given names for purposes of clarity. No disrespect is intended.

road and detect large objects considerably farther south on the road.

On June 23, 2001, Tracy and Mrs. Smith moved a group of calves from the east tract to the west tract in order to wean them. These calves weighed 350 to 400 pounds. They were placed in a cattle trailer, driven across Y Highway onto the west tract, and released into the field.

The day after the calves had been moved onto the west tract, the accident took place. At approximately 8:30 p.m. on June 24, 2001, Travis and Cindy were standing on their porch with Cindy's brother, Jeremy Heidrick.[2] Tracy was sitting on a four-wheeler in their yard, facing toward the west. As the four persons were having a conversation, Cindy noticed that one of the Smiths' black calves had gotten out and was on the highway. She told Travis and Tracy, who looked toward the road and also saw that the calf was out. Although it was close to dark, the 350–pound calf could be easily and plainly seen. It was standing in the middle of the road next to Tracy's driveway. The distance from the calf to the porch was approximately 170 feet. Travis and Tracy immediately started after the calf so they could put it back in the pasture. Travis ran toward the road on foot, and Tracy turned his four-wheeler around and drove toward the road.

The collision took place only seconds after Cindy first saw the calf was out. Cindy, Travis and Tracy all watched Heidrick's vehicle hit the calf. She testified that "[Heidrick] came around the curve up in front of our house, and I looked at [Jeremy] and said, my God, she's going to hit it." Heidrick then hit the calf before Travis or Tracy could reach the animal. The impact occurred right at Tracy's driveway. When the calf was struck, it

was standing in nearly the same spot where Cindy had first seen it. None of the Smiths' witnesses observed Heidrick brake or swerve before she hit the calf.

The calf sustained no serious injuries in the collision. After the animal was struck, it jumped over the cattle guard and re-entered the east tract. Travis testified that, from the point where the calf was struck, he could "see in a straight line unobstructed to the north on Y Highway" a little more than 500 feet.

Heidrick testified that she lived about 1½ miles west of the Smiths' farm. Heidrick drove on Y Highway twice a day as she traveled to and from work. On the evening of June 24th, Heidrick was on her way home. The weather was clear, and the asphalt roadway was dry. She rounded the curve just north of the Smiths' farm and headed south on Y Highway at about 50 miles per hour. As she topped the little hump in the road near Tracy's driveway, she struck something. For a moment, she did not know what she had hit. Heidrick testified, however, that "when I turned around and looked I could see the black calf." Although Heidrick admitted that the calf had to have been in the middle of the road at the moment of impact, she "didn't see it." Heidrick conceded that she did not attempt to brake or swerve prior to hitting the calf. After the collision, she pulled into the Smiths' driveway and parked her car. Photographs of the damage to her car were admitted in evidence. These pictures show that Heidrick's vehicle basically sideswiped the calf. The impact dented the top of the left fender, cracked the left corner of the windshield and knocked the driver's side mirror off of the car.

At the conclusion of the Smiths' case, they asked the trial court to take judicial

---

2. All time references in this opinion refer to Central Daylight Saving Time.

notice of the reaction times and braking distances in a chart contained in the Missouri Driver's Guide. The trial court agreed to do so and took judicial notice of the fact that an automobile traveling at 55 miles per hour can be brought to a complete stop in 255 feet. That figure is derived from adding 121 feet of reaction time to 134 feet of braking distance.

### III. Discussion and Decision

The sole issue for decision is whether the trial court should have submitted Instruction No. 7, the Smiths' comparative fault instruction. Heidrick contends the instruction lacked evidentiary support because there was no "credible evidence" that she had the time and distance to have seen the calf, reacted to it, and either swerved or stopped in time to avoid the collision. We begin by noting that it is not our function to weigh the evidence or assess the credibility of witnesses. The evidence in this case was conflicting on many matters, including the issues of the Smiths' liability and Heidrick's comparative fault. "We are not permitted to second-guess whom the jury chooses to believe, as this court leaves both the issue of credibility and the weight to be afforded conflicting evidence to the jury." *Smith v. State,* 148 S.W.3d 330, 336 (Mo.App.2004). "The jury is the sole judge of the credibility of the witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony." *Bland v. IMCO Recycling, Inc.,* 67 S.W.3d 673, 682 (Mo. App.2002). Thus, our role is limited to determining whether the evidence and reasonable inferences derived therefrom, when viewed in a light most favorable to the jury's verdict, are sufficient to support the Smiths' theory that Heidrick was partly or wholly at fault for failing to keep a careful lookout as submitted in Instruction No. 7.

This Court's decision in *Wiskur v. Johnson,* 156 S.W.3d 477 (Mo.App.2005), contains a concise summary of the law concerning the submission of a lookout instruction which we find apropos:

> The essence of the lookout instruction is a failure to see and a failure to act. The failure to see involves a motorist's failure to become aware of other motorists, pedestrians, or objects that present a dangerous situation, and the failure to act is the motorist's failure to take precautionary action to avoid that danger. In other words, "The 'lookout' duty requires motorists to exercise the highest degree of care to discover the presence of other persons and objects upon the streets and highways and to become aware of dangerous situations and conditions." For a lookout submission to be proper, substantial evidence must show that the breach of that duty was the proximate cause of the accident. The proper test of failure to keep a careful lookout as the proximate cause is whether the driver of the colliding vehicle, exercising the highest degree of care, could have seen the other vehicle in time to have taken effective precautionary measures to avoid the accident.

*Id.* at 480 (citations and footnote omitted). The disposition of this appeal, then, depends on our answer to the following question: by exercising the highest degree of care, could Heidrick have seen the Smiths' calf on the road in time to take effective precautionary measures to avoid the collision?

We first address the question of whether sufficient evidence was presented to create a jury question on the issue of Heidrick's ability to have seen the calf on the road prior to the collision. We believe there was. Cindy testified that the collision occurred at 8:30 p.m. At that time of

day, the sun had not yet set.[3] Cindy, Travis and Tracy all testified that they could easily and plainly see the 350–pound calf standing in the middle of the road, just seconds before the collision took place, from a distance of approximately 170 feet away. The animal remained standing in approximately the same place on the road until it was hit by the car. Tracy testified that, at the point where the impact occurred, the view to the north was unobstructed for a distance of over 500 feet. Moreover, these witnesses were able to see Heidrick's dark blue Mustang as soon as it rounded the corner. At that point, the car was well over 500 feet away. They then watched the car as it approached and struck the calf. Finally, although Heidrick denied seeing the calf before she hit it, she admitted that she was able to see the calf in the road immediately after the collision when she turned around and looked back in that direction.[4] Based on this testimony, there was sufficient evidence for the jury to infer that Heidrick could have seen a 350–pound black calf standing in the middle of the highway at least 500 feet before she hit the animal.

We next address the question of whether sufficient evidence was presented to create a jury question on the issue of Heidrick's ability to take precautionary measures to avoid the collision. We believe there was. Heidrick's view of the road was unobstructed for a distance of over 500 feet as she approached the point of impact. During that entire time, the calf was clearly visible, standing in the middle of the road. Heidrick could have reacted to the danger, applied her brakes, and brought her car to a complete stop in less than 255 feet. Therefore, the jury could have inferred that Heidrick had ample time and distance to avoid the collision by stopping her vehicle before she struck the calf. Alternatively, the evidence unequivocally established Heidrick's car basically sideswiped the calf, which was standing in the middle of the road when it was hit. "The mobility of a car and the quickness with which it may be swerved is a matter of common knowledge." *Smiley v. Farmers Ins. Co., Inc.*, 749 S.W.2d 711, 713 (Mo.App.1988). Given the glancing nature of the impact, the jury could have inferred that Heidrick had the ability to avoid the collision by swerving, or slowing and swerving, her car enough to miss the calf.

In conclusion, Heidrick's comparative fault was vigorously disputed, and the evidence relevant to this affirmative defense was in conflict. Accordingly, it was up to the jury to decide whether Heidrick was negligent for failing to keep a careful lookout. *Rickman v. Sauerwein*, 470 S.W.2d 487, 489 (Mo.1971) (negligence is ordinarily a question for the jury, and it always is when the evidence on the issue is conflicting). That being the case, we are bound by the jury's determination because "the weight and credibility of the evidence to support the verdict in favor of the defendant[s] is not an open question in this

**3.** We may take judicial notice of the time that the sun sets on the date and at the place of an accident. *Larrea v. Ozark Water Ski Thrill Show, Inc.*, 562 S.W.2d 790, 792 (Mo.App. 1978). According to data from the United States Naval Observatory, the sun set in Neosho, Missouri, on June 24, 2001 at 8:41 p.m.

**4.** Heidrick's testimony that she did not see the calf prior to impact does not preclude the submission of the Smiths' lookout instruction.

The pertinent inquiry is whether she reasonably could have seen the calf on the road, not whether she actually did so. *Riscaldante v. Melton*, 927 S.W.2d 899, 902 (Mo.App.1996). A driver "is held to have seen what looking would have revealed and failure to do so is negligence as much as if he had not looked at all." *Countryman v. Seymour R–II School Dist.*, 823 S.W.2d 515, 517 (Mo.App.1992).

court." *Richardson v. Moreland,* 435 S.W.2d 335, 337–38 (Mo.1968).

Heidrick's point on appeal is denied, and the judgment of the trial court is affirmed.

PARRISH, P.J., and SHRUM, J., Concur.